IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **HONORABLE RAYMOND M. JEFFERSON**, River Place, 60 Havelock Road Block A - 4, Unit #03 - 02 Singapore 169658 | ) ) ) ) ) | Civil Action No. _____ |
| **Plaintiff**, | ) ) ) |  |
| **v.** | ) ) |  |
| **HONORABLE SETH D. HARRIS** former Deputy Secretary of the U.S. Department of Labor, in his individual and official capacities, 101 Garden Avenue Ives Hall Faculty Wing RM 309 Ithaca, NY 14853 | ) ) ) ) ) ) ) ) |  |
| and | ) ) |  |
| **U.S. DEPARTMENT OF LABOR** 200 Constitution Avenue, NW Washington, D.C.  20210 | ) ) ) ) |  |
| and | ) ) |  |
| **DANIEL R. PETROLE** Former Acting Inspector General of the Office of the Inspector General of the U.S. Department of Labor in his individual and official capacity, 11232 Beaver Trail Court Reston, VA 20191-4321 | ) ) ) ) ) ) ) |  |
| and | ) ) |  |
| **ASA CUNNINGHAM** Supervisor in the Office of the Inspector General for the U.S. Department of Labor in his individual and official capacity, 3509 Rushton Road Fairfax, VA 22033 and | ) ) ) ) ) ) |  |

1

c/o Office of Inspector General )
200 Constitution Avenue, NW )
U.S. Department of Labor )
Washington, D.C.  20210 )
)
and )
)
**DAVID RUSS** )
Agent in the Office of the Inspector General of the )
U.S. Department of Labor in his individual and )
official capacity, )
c/o Office of Inspector General )
200 Constitution Avenue, NW )
U.S. Department of Labor )
Washington, D.C.  20210 )
)
and )
)
**JAMES POWELL** )
Agent in the Office of the Inspector General for the )
U.S. Department of Labor in his individual and )
official capacity, )
c/o Office of Inspector General )
200 Constitution Avenue, NW )
U.S. Department of Labor )
Washington, D.C.  20210 )
)
and )
)
**OFFICE OF INSPECTOR GENERAL** )
200 Constitution Avenue, NW )
U.S. Department of Labor )
Washington, D.C.  20210 )
)
and )
)
**COUNCIL OF THE INSPECTORS GENERAL** )
**ON INTEGRITY AND EFFICIENCY** )
935 Pennsylvania Avenue, NW )
Room 3973 )
Washington, DC  20535-001 )
)
**Defendants**. )

## NATURE OF ACTION

1.      This case is about the Department of Labor's Office of Inspector General violating the law by wilfully and wantonly issuing a false legal Memorandum and Report about former Assistant Secretary Raymond Jefferson.  It is also about Deputy Secretary Seth D. Harris constructively discharging Jefferson on false grounds, and then repeatedly depriving Jefferson of his constitutional rights.

2.      Jefferson files this Complaint not only to reverse the OIG's baseless conclusions, but also to vindicate his own reputation as well as those of his senior staff who served their country with honor and who were also falsely condemned.

## JURISDICTION

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## VENUE

4.      Venue in this Court is proper because all relevant events took place in the District of Columbia; the institutional defendants are a U.S. Department, a federal inspector general's office, and a council created by federal statute and are all located in the District of Columbia; and the individual defendants currently are, or in the past were, officials and/or employees at the defendant federal institutions that are all located in the District of Columbia. 28 U.S.C. §§ 1391(b)(2), (e)(1)(A)&(B).

## JURY REQUEST

5.      Plaintiff Jefferson requests that this case be tried before a jury.

## PARTIES

6.      Plaintiff the Honorable Raymond M. Jefferson ("**Jefferson**") is a citizen of the United States who currently resides in Singapore.  At all relevant times, Jefferson was the

former Assistant Secretary of Labor for Veterans' Employment and Training Services ("**VETS**") at the U.S. Department of Labor.  VETS is a DOL agency tasked with providing resources and expertise to assist and prepare U.S veterans to obtain meaningful careers, maximize their employment opportunities, and protect their employment rights.

7.      Defendant the Honorable Seth D. Harris ("**Harris**") is a citizen of the United States and, upon information and belief, a law professor who currently resides in Ithaca, New York.  At all relevant times, Harris was the Deputy Secretary of the U.S. Department of Labor and is being sued in his individual and official capacities.

8.      Defendant United States Department of Labor ("**DOL**") is a federal department established by act of Congress and is located in Washington, D.C.

9.      Defendant Daniel R. Petrole ("**Petrole**") is a citizen of the United States who upon information and belief resides in Reston, VA.  At all relevant times, Petrole was the Acting Inspector General of the Office of Inspector General at the U.S. Department of Labor and is being sued in his individual and official capacities.

10.      Defendant Asa (Gene) Cunningham ("**Cunningham**") is a citizen of the United States who upon information and belief resides in Fairfax, Virginia.  At all relevant times, Cunningham was a Supervisor at the Office of Inspector General at the U.S. Department of Labor and is being sued in his individual and official capacities.

11.      David Russ ("**Russ**") is a citizen of the United States who upon information and belief resides in the metropolitan area of Washington, D.C.  At all relevant times, Russ was an Assistant Special Agent in Charge at the Office of Inspector General at the U.S. Department of Labor and is being sued in his individual and official capacities.

4

12.     James Powell ("**Powell**") is a citizen of the United States who upon information and belief resides in  the metropolitan area of Washington, D.C.  At all relevant times, Powell was an Assistant Special Agent in Charge at the Office of Inspector General at the U.S. Department of Labor and is being sued in his individual and official capacities.

13.     Defendant Office of Inspector General at the U.S. Department of Labor ("**OIG**") is an agency created by an act of Congress and is located in Washington, D.C.  OIG has a dual mission: (1) to conduct audits to review the effectiveness, efficiency, economy, and integrity of all DOL programs and operations and (2) to conduct criminal investigations to combat the influence of labor racketeering and organized crime in the nation's labor unions.

14.     Defendant the Council of the Inspectors General On Integrity and Efficiency ("**CIGIE**") is an independent entity within the Executive Branch established by the Inspector General Reform Act of 2008, as amended ("**IGA**"), and for purposes of this lawsuit, functions as an agency that reviews complaints of wrongdoing against individual inspectors general or their individual staff members.  CIGIE and its Investigation Committee operate and convene in Washington, D.C.

## LEGAL AUTHORITY GOVERNING THE DEFENDANTS

15.     At all times relevant to this case, Harris and DOL were governed by and subject to the Due Process Clause of the Fifth Amendment of the United States Constitution; the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("**APA**"); and governing case law of the U.S. Supreme Court and the U.S. federal courts of the District of Columbia, including but not limited to cases establishing due process violations by federal officials or agencies, cases establishing the "arbitrary and capricious" standard for federal agency action, and unconstitutional conditions doctrine cases.

16.     At all times relevant to this case, Petrole, Cunningham, Russ, Powell, OIG, and CIGIE were governed by and subject to the Due Process Clause of the Fifth Amendment of the United States Constitution; the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*; the Inspector General Act of 1978, as amended, 5 U.S.C. App. §11(d) ("IGA"); the CIGIE "Quality Standards for Investigations," November 15, 2011 ("QSI") and/or the President's Council on Integrity and Efficiency and the Executive Council on Integrity and Efficiency's "Quality Standards For Investigations," December 2003 ("QSI-2003"); the President's Council on Integrity and Efficiency, "Quality Standards for Federal Officers of Inspector General," October 2003 ("Silver Book"); the Integrity Committee Policies and Procedures ("ICP&P") of the Council of the Inspectors General On Integrity and Efficiency; the DOL OIG Manual, including but not limited to IN 8-1100; the United States Department of Justice's "Giglio Policy;" the Federal Rules of Evidence, including those rules and case law regarding hearsay evidence; and governing case law of the U.S. Supreme Court and the U.S. federal courts of the District of Columbia, including but not limited to cases establishing due process violations by federal officials or agencies, cases establishing the "arbitrary and capricious" standard for federal agency action, and unconstitutional conditions doctrine cases.

## STATEMENT OF CASE

### Jefferson's Efforts to Reform VETS

17.     A graduate of West Point, Harvard Business School, and Harvard Kennedy School of Government, as well as a wounded warrior, Jefferson was appointed by President Obama to serve as the Assistant Secretary of VETS.  A short while after assuming office, Jefferson observed substantial operational and management problems in VETS, including its procurement agency, the Office of Agency Management and Budget ("**OAMB**"), which was

run by then-Director Paul Briggs ("**Briggs**") and then-Deputy Director Angela Freeman ("**Freeman**").

18.     In order to improve performance at VETS, Jefferson instructed former Deputy Assistant Secretary John McWilliam ("**McWilliam**") and Jefferson's former Chief of Staff Amit Magdieli ("**Magdieli**") to help arrange organizational and program assessments, management reviews, and comprehensive training for all staff in order to increase performance, efficiency, and effectiveness.  To do this, Jefferson asked McWilliam and Magdieli to look into hiring three renowned management consultants and experts in leadership: Stewart Liff ("**Liff**"), Ron Kaufman ("**Kaufman**"), and Mark Tribus ("**Tribus**").  Jefferson repeatedly instructed McWilliam and Magdieli to act "legally, ethically, but also quickly," in their efforts to hire the three trainers/consultants.  McWilliam and Magdieli, in turn, turned to and relied on Freeman and Briggs, as senior OAMB officials at VETS, as well as senior professional staff at DOL's Office of Acquisition Management Services ("**OAMS**") for all contracting methods and decisions regarding hiring Liff and Kaufman.

19.     OAMS is the DOL agency that establishes the procurement and grant policy for the Department of Labor, and performs the actual contracting for VETS.  OAMS is under the Office of the Assistant Secretary for Administration and Management ("**OASAM**"), and was run by another DOL Assistant Secretary, Michael Kerr ("**Kerr**"), not by Jefferson.  OASAM alone had the responsibility and authority to approve and structure contracts for hiring Liff and Kaufman, not VETS.  Jefferson and his staff had no authority or influence over OASAM, its staff, or its procurement decision-making.  Yet without explanation, Petrole, Cunningham, Russ, and Powell chose not to investigate OASAM and its role in the allegedly improper contracts with Liff and Kaufman, despite finding that unnamed senior OASAM officials had

committed "procurement violations" of rules that they were entrusted to follow and enforce during the Liff and Kaufman contracting process.

### The Three Contracts At Issue

20.     OIG's failure to investigate Kerr's OASAM not only resulted in an incomplete and inaccurate Report regarding how the Liff and Kaufman contracts were formed, but it also constituted Petrole's, Cunningham's, Russ's, and Powell's violation of their obligation to conduct a fair and unbiased investigation.  Even worse, upon information and belief, Petrole, Cunningham, Russ, and Powell acted out of political considerations or intimidation.  Further upon information and belief, Kerr and Deputy Secretary Harris had a longstanding personal friendship, and Petrole, Cunningham, Russ, and Powell did not investigate OASAM or Kerr out of deference to, or fear of, Harris—the second most powerful official at DOL.  Moreover, Harris refused to recuse himself during the investigation or afterward—even after he received the Memorandum and Report that found procurement violations by senior officials at Kerr's OASAM.  Nor did Harris order OIG to investigate and report on the "procurement violations" committed by senior OASAM officials and to report on them.

21.     Instead OIG, Petrole, Cunningham, Russ, and Powell issued a fifty-four page, single-spaced July 21, 2011 Report (Investigative Report 14-1301-0002 IA ("**Report**") and a July 21, 2011 OIG legal Memorandum as a kind of executive summary of the Report ("**Memorandum**").  The Report and Memorandum accused Jefferson and McWilliam of legal and ethical violations by allegedly pressuring Freeman to hire Liff and Kaufman in violation of federal procurement rules.  The Report and Memorandum also accused Jefferson of improperly using a VETS procurement card to hire and pay Tribus for his services.

22.   It is uncontested that Jefferson had issued a standing order to McWilliam, Magdieli, and other members of his staff to act "legally and ethically" when conducting VETS business, including contracting.  Furthermore, out of their own sense of duty and professional ethics, McWilliam and Magdieli repeatedly sought guidance from senior DOL procurement professionals—Freeman and Briggs at VETS's OAMB as well as from career officials at OASAM—about whether VETS could hire Liff and Kaufman and how to do so properly.  What is more, McWilliam and Magdieli specifically asked to be informed if there were any improprieties or other concerns with the way in which Liff and Kaufman were hired.  In fact, McWilliam took special care to insulate procurement professionals from senior political appointees such as Jefferson so as to avoid any possibility of undue sway.

23.   Not only did Freeman and Briggs (and OASAM officials) not report any improprieties or object to the way in which Liff and Kaufman were being hired, but it was OASAM, Freeman, and to a lesser extent Briggs, who suggested the specific direct-subcontracting method to hire Liff and Kaufman, and it was OASAM's professional staff that wrote and executed the first Liff contract.  (As explained below, Freeman never bothered to obtain a contract from OASAM before directing a contractor to hire Kaufman and Liff a second time, thereby violating numerous Federal Acquisition Rules ("**FAR**").

24.   As for Tribus, the third contractor, Jefferson obtained written, pre-approval from DOL's legal counsel, DOL's Office of the Solicitor Of Labor ("**SOL**"), for hiring and paying Tribus after extensive consultations with both SOL and OASAM.

25.   But after Jefferson and McWilliam disciplined Briggs and Freeman for poor performance and for making false statements to them (in Freeman's case, making false statements on several occasions and for violating FAR in connection with the Kaufman and

second Liff contracts), Freeman left DOL rather than face disciplinary proceedings.  But she did not go quietly.

### Report's False Legal And Factual Conclusions

26.     In retaliation against Jefferson and McWilliam, she filed three bogus Equal Employment Opportunity ("EEO") claims that were quickly dismissed.  She also filed the OIG complaint at issue here.  Freeman, and soon after Briggs, alleged contractual improprieties with the hiring of Liff—despite the fact that it was OASAM that suggested, and Freeman and Briggs who engineered, the very direct-subcontracting method that they claimed was improper. Freeman also alleged that Jefferson and McWilliam accepted a gift greater than $25 in value from Kaufman, because Kaufman had provided a *pro bono* training session to dozens of VETS staff members—again pursuant to procedures reviewed and approved by the SOL.  (OIG, Petrole, Cunningham, Russ, and Powell held in the Report that this allegation had not been substantiated.)

27.     Regarding Liff and Kaufman, OIG, Petrole, Cunningham, Russ, and Powell held that Jefferson "pressured and/or intimidated" Freeman to by-pass procurement rules.  But in fact, the undisputed evidence from everyone with direct knowledge of those contracting decisions is that it was OASAM along with Jefferson's accusers—Freeman with support from Briggs—who suggested and executed the direct-subcontracting method at issue.  Indeed, even Freeman admits this.  And contrary to Freeman's allegations of feeling pressured to violate multiple procurement regulations, there is *no* objective evidence of Jefferson, McWilliam, or Magdieli pressuring Freeman or anyone else to do anything; rather, all of the objective evidence shows that Freeman's allegations were false.

28.     The OASAM contracting officer is legally responsible for ensuring that procurement rules are followed, not the ASVET's (Jefferson's) office.  In fact, it was the OASAM contracting officer who awarded the first Liff contract based upon requisitions submitted by Freeman.  As for the second Liff contract, Freeman violated FAR by ordering work to begin despite lacking authority to do so, failing to submit proper documentation to OASAM, and the contract not having been approved.  Knowing this, OASAM still approved the second Liff contract after the fact.

29.     Regarding the Kaufman contract, Freeman again failed to submit proper documentation to OASAM, again unlawfully approved the work on her own initiative and without authority, and again did so without any contract in place—again violating FAR.  Freeman then tried to cover-up her FAR violations by fabricating evidence, blaming a computer system, and making outright false statements to McWilliam and OASAM officials who were investigating why Kaufman had not been paid.  This time, OASAM did not ratify the Kaufman contract.

30.     Regarding the third service provider, Tribus, SOL's own Deputy Solicitor (the Department's second-highest ranking lawyer) twice informed Petrole's investigators—Cunningham, Russ, and Powell—that Jefferson's actions were "both legal and ethical."  But Petrole, Cunningham, Russ, and Powell—none of whom is a lawyer—ignored this legal determination by SOL and found instead that Jefferson, McWilliam, and Magdieli had violated unspecified rules by hiring Tribus.  Petrole, Cunningham, Russ, and Powell also ignored the fact that Jefferson obtained pre-approval from SOL on hiring Tribus and the fact that SOL and OASAM closely reviewed and approved the Tribus contract, including the use of a procurement card to pay Tribus.  And it was OIG that had instructed Jefferson to seek the advice of SOL (or

OASAM) in the first place, after OIG's Cunningham refused to provide guidance to Jefferson and McWilliam when they had sought OIG's help.

31.    Petrole's, Cunningham's, Russ's, and Powell's Report contains many factual errors—both affirmatively false statements as well as important omissions.   For example, Petrole, Cunningham, Russ, and Powell falsely reported that both Liff and Kaufman were former colleagues of Jefferson at a consulting firm.   In doing so, they falsely suggested that Jefferson improperly used his influence to benefit his friends and former co-workers.   But in fact, Jefferson had never been a colleague of, or worked with, Liff or Kaufman.   Jefferson had never even met Liff before joining the Obama Presidential transition team.   And Jefferson had only briefly met Kaufman twice socially and once before entering the Obama Administration to discuss customer service best practices.

32.    Having invented a false motive for Jefferson's alleged violations, Petrole, Cunningham, Russ, and Powell then committed a series of actions that violated the Due Process Clause, the Administrative Procedure Act, regulations governing inspectors general, and the Federal Rules of Evidence in order to find Jefferson and McWilliam liable for Freeman's actions.

33.    For example, Petrole, Cunningham, Russ, and Powell did not notify Jefferson and McWilliam that they were the targets of the investigation or what the allegations against them were.   Nor did they tell Magdieli.   Jefferson, McWilliam, and Magdieli were thus not able to provide a full and accurate account of how all of the contracts took place and who was responsible for various actions and decisions.   And of course, they could not defend themselves against the allegations.   As a result, the Report's depiction of one of the core issues of the

investigation—the roles of Jefferson and McWilliam in the Liff and Kaufman contracting—was false.

34.     And after violating Jefferson's and McWilliam's due process rights to notice and a fair opportunity to be heard, Petrole, Cunningham, Russ, and Powell used the deceptive tactic in the Report of depicting incomplete portions of Jefferson's and McWilliam's statements as their "response to the allegation," when in fact Petrole, Cunningham, Russ, and Powell kept the allegations hidden from Jefferson and McWilliam.  It was only after Jefferson and McWilliam received a copy of the Report and Memorandum did they learn for the first time that they had been accused of wrongdoing and what those accusations were.  Not only that, Petrole, Cunningham, Russ, and Powell went so far as to use the wrong OIG forms, forms that did not notify Jefferson and McWilliam of their rights, did not disclose that they were both targets of the investigation, and did not reveal the allegations against them.

35.     As another example, Petrole, Cunningham, Russ, and Powell knew that both Freeman and Briggs had been disciplined by Jefferson and McWilliam, but they did not disclose this impeachment evidence.  In fact, Petrole, Cunningham, Russ, and Powell issued their findings condemning Jefferson and McWilliam based almost exclusively on Freeman's claim of *feeling* pressured—despite OIG finding that Freeman had previously made false statements to OIG about Jefferson during a prior investigation a year earlier; had previously made false statements to Jefferson and McWilliam; had a history of making false claims and spreading false rumors about Jefferson, McWilliam, and others; had violated Federal Acquisition Regulations (FAR) and then engaged in a cover-up; and had admitted being to blame for contracting decisions that she later claimed were improper and for not telling Jefferson or anyone else that they were improper until she resigned from VETS rather than face

disciplinary proceedings.   The rules governing inspectors general required that Petrole, Cunningham, Russ, and Powell disclose all of this impeachment evidence; but they kept all of it hidden.

36.     Furthermore, Petrole, Cunningham, Russ, and Powell relied almost exclusively on Freeman's statements—uncorroborated by any other testimonial or documentary evidence— that she had felt pressured by Jefferson to violate procurement rules.  In fact, even Briggs did not corroborate Freeman's claims of Jefferson pressuring or intimidating staff during the Liff and Kaufman contracting process.   There are no emails or testimony from Jefferson, McWilliam, Magdieli, or anyone else that corroborate Freeman's story of being pressured to violate regulations.   Petrole, Cunningham, Russ, and Powell never once identified a single instance of Jefferson, McWilliam, or Magdieli taking some action, withholding some benefit, saying something, or doing anything that would constitute pressure, intimidation, or improper influence.  In fact, Petrole, Cunningham, Russ, and Powell did not even report an *allegation* that a specific action or statement by Jefferson, McWilliam, or Magdieli took place that could be interpreted as pressure, intimidation, or undue influence.   But nowhere did Petrole, Cunningham, Russ, and Powell bring attention to this glaring lack of evidence against Jefferson and McWilliam in their Report, let alone try to justify their findings of fault in the absence of any such evidence.

37.     Petrole, Cunningham, Russ, and Powell on several occasions also purposely distorted Magdieli's testimony by taking portions out of context and omitting testimony that was exculpatory, in order to suggest that Jefferson ignored Magdieli's advice not to proceed with the Liff and Kaufman contracts, when that was false.  Similarly, Petrole, Cunningham, Russ, and Powell relied on Freeman's hearsay, which was never corroborated by any of the

people actually present, in order to suggest that Jefferson was involved in the Liff contracting process, when in fact he was not.

38.     Petrole, Cunningham, Russ, and Powell also failed to disclose Freeman's undisputed FAR violations and attempted cover-up—perhaps because they knew that these serious violations eviscerated Freeman's credibility.  In fact, not only did Petrole, Cunningham, Russ, and Powell fail to reveal Freeman's FAR violations and attempted cover-up, they actually obfuscated Freeman's violations by misrepresenting two of Freeman's emails as evidence of Jefferson and McWilliam pressuring her to direct-subcontract the Liff and Kaufman contracts, when the first email proved that Freeman had violated FAR and the second, self-serving email was part of Freeman's efforts to cover it up.

39.     Petrole, Cunningham, Russ, and Powell also committed numerous legal errors. On the central issue of the case—DOL's direct-subcontracting procedure in which existing prime contractors were directed to hire Liff and Kaufman as subcontractors for the training programs—Petrole, Cunningham, Russ, and Powell never cited any legal authority that this was improper or unlawful.  To the contrary, both the Department of Defense OIG and the Government Accounting Office (GAO) had previously upheld direct-subcontracting by the Air Force and another agency respectively, and two federal courts had not indicated any problem with direct-subcontracting either.  But again, Petrole, Cunningham, Russ, and Powell never reveal this, let alone explain why they disagreed with authorities that had upheld the lawfulness of direct-subcontracting.

40.     Petrole, Cunningham, Russ, and Powell also ignored the fact that the allegedly improper Liff and Kaufman direct-subcontracting had been widely used throughout DOL for at least four years prior to Jefferson's arrival at DOL.  They also ignored the fact that it was a

15

senior OASAM official who first suggested to McWilliam that VETS could use direct-subcontracting to hire Liff and that Liff was first hired on an OASAM contract.  They further ignored the fact that it was Freeman who then proposed direct-subcontracting Liff and Kaufman on two additional contracts.   In addition, Petrole, Cunningham, Russ and Powell did not disclose that the OIG had never before held that direct-subcontracting was inappropriate or unlawful or that they and OIG had not notified DOL officials or employees that direct-subcontracting was unlawful or inappropriate prior to holding that direct-subcontracting was unlawful and unethical in the Report.  Nor did they explain why for the first time they held Jefferson, McWilliam, and Magdieli liable for a practice that had been used throughout DOL for years.  Finally, Petrole, Cunningham, Russ, and Powell never explained or justified why their interpretation of FAR and DOL's regulations should take precedence over DOL's and its agencies' interpretation of federal procurement laws, since DOL and its agencies—not OIG—were charged with interpreting and applying those laws and regulations and thus enjoyed agency deference.

41.     As another example, because there was no evidence that Jefferson and McWilliam (or Magdieli) ever pressured Freeman to violate FAR, Petrole, Cunningham, Russ, and Powell concocted a vicarious liability standard to hold that Jefferson and McWilliam "knew or should have known" that Freeman had violated FAR.  They concocted this legally and factually baseless "knew or should have known" liability standard even though they never disclosed that Freeman had engaged in a cover-up and that it was McWilliam (with OASAM officials) who uncovered those violations—not OIG.

42.     In addition to concocting a new liability standard, Petrole, Cunningham, Russ, and Powell also contorted the law to find a violation where there was none.  One of Freeman's

uncontested FAR violations was her directing that a prime contractor hire Kaufman, despite Freeman not having authority to do so and despite there being no valid contract in place because Freeman had not submitted the proper documentation.  Without a valid contract from OASAM, Kaufman was not paid for his services.  Petrole, Cunningham, Russ, and Powell converted VETS's unpaid debt owed to Kaufman into VETS's "acceptance of voluntary personal services" from Kaufman—and then held Jefferson as the head of VETS to blame. Petrole, Cunningham, Russ, and Powell twisted VETS's failing to pay for services into accepting voluntary services, even though they knew that Kaufman did not provide those services *gratis* but rather continued to ask for payment.  And even though Petrole, Cunningham, Russ, and Powell knew that Freeman had no authority to direct a prime contractor to hire Kaufman without a contract (which is why Kaufman was not paid) and then engaged in a cover-up to hide what she had done, they still blamed Jefferson.

43.     As a final example, the Memorandum claimed that Jefferson violated seven statutes, regulations, and other legal authorities.  But the Report never even cited—let alone discussed or corroborated—any of the seven legal violations listed in the Memorandum.  In fact, the Report never cited any rules or regulations that were violated, never set forth the elements that must be proved in order to establish a violation, and never explained what specific actions taken by Jefferson or McWilliam constituted a violation.  Petrole, Cunningham, Russ, and Powell were thus able to blame Jefferson and McWilliam for committing unspecified violations without substantiating any of them.  Petrole's, Cunningham's, Russ's, and Powell's fundamental failure to cite even one regulation in the Report that they found Jefferson and McWilliam had violated constituted a major breach of the rules and ethics governing inspectors general.

17

**Harris Constructively Discharged Jefferson Without A Chance To Clear His Name**

44.     Upon information and belief, Petrole, Cunningham, Russ, and Powell presented their bogus Memorandum and Report to Harris on or about Thursday, July 21, 2011.

45.     At the end of the next day, July 22, 2011, Harris called Jefferson into his office and gave him a copy of the Memorandum.  In addition, Harris handed him a prepared one-page memorandum ("First Harris Memorandum"), which stated in pertinent part: "By a memorandum dated July 21, 2011, I received a report of investigation from [OIG].   The findings identify very serious misconduct . . . including ethics and procurement violations. . . . I am putting you on Administrative Leave—effective immediately and until further notice.  You . . . are not to use or access DOL-issued equipment; you are not to have any contact with VETS staff; and you are not to contact any of the parties who were involved in this matter."

46.     Harris did not provide Jefferson with an opportunity to read the Memorandum or Report prior to putting him on Administrative Leave; did not provide Jefferson with notice of what conduct or action(s) constituted misconduct, including alleged ethics and procurement violations, beyond the vague and inaccurate descriptions contained in the three-page Memorandum; and did not provide Jefferson with any opportunity to be heard so that he could rebut the vague allegations made against him in the Memorandum.

47.     Furthermore, Harris required Jefferson to leave the building immediately; denied him access to his records and files; and forbade him from having any contact with VETS staff, including McWilliam and Magdieli, in order, upon information and belief, to prevent Jefferson from accessing information and evidence with which he could refute the Memorandum's false charges and exonerate himself.

48.     The following Monday, July 25, 2011, Harris gave Jefferson a redacted version of the Report without any of the dozens of exhibits that were an integral part of the Report. Upon information and belief, Harris refused to provide Jefferson with an un-redacted, full Report in order to prevent Jefferson from having complete notice of the allegations against him and a meaningful opportunity to be heard and refute the Report's and Memorandum's false charges.

49.     The next day, Jefferson met with his lawyer in the morning and showed him the incomplete Report.   At midday, Jefferson and his lawyer called Harris and his assistant. Jefferson's lawyer informed Harris that he had not had time to read all of the incomplete, redacted Report; that Jefferson had a right to the entire un-redacted Report that included the exhibits that were an integral part of the Report; and that Jefferson had a right to review the entire record and be heard in order to refute the allegations.   Jefferson's lawyer further represented that even a partial review of the incomplete Report revealed many, material errors of fact that Jefferson could disprove.

50.     Harris responded by telling Jefferson that he had four hours in which to resign or be fired.   If he resigned, Harris told Jefferson that his resignation would take effect on September 1, 2011 so that Jefferson would still receive a salary through August, 2011.   But Harris conditioned this offer on Jefferson abiding by all of the terms and restrictions in the First Harris Memorandum (July 22, 2011).   If Jefferson did not resign by close of business July 26, 2011, Harris said that he would fire Jefferson immediately and without any severance pay.

51.     Jefferson's lawyer asked for an additional day in order to finish reviewing the incomplete Report, examine Jefferson's legal options, and advise Jefferson regarding whether or not to resign. Harris denied that request.   When Jefferson's lawyer protested that Jefferson

19

had a due process right to notice of the charges against him and an opportunity to be heard in order to refute them, Harris told Jefferson, "You have no due process right!"  Harris repeated his four-hour ultimatum, thereby constructively discharging Jefferson who had no other source of income at that time.

52.     Harris (1) denied Jefferson's lawyer's request for additional time to finish reading the incomplete Report, counsel Jefferson, and present a defense; (2) denied Jefferson's request for an opportunity to review all of the allegations and evidence and rebut the charges; and (3) pressured Jefferson into accepting the conditions set forth in the First Harris Memorandum—all in order to deprive Jefferson of notice of the allegations and a meaningful opportunity to be heard so that he could rebut the Report's and Memorandum's false charges and clear his name.

53.     Faced with this constructive discharge, Jefferson submitted a letter of resignation to then-Secretary of Labor Hilda Solis late in the afternoon of July 26, 2011.  At that moment, Jefferson became the highest-ranking member of the Obama Administration forced to resign under a false ethics scandal.

**Public "Scandal" And Humiliation**

54.     On July 27, 2011, DOL and OIG convened a joint press conference, publicly disseminating the Report's and Memorandum's false charges, errors of fact, and mistakes of law.  DOL and OIG did not notify Jefferson that they would hold a press conference.  Nor did they notify Jefferson that they would release and comment on the Report, including repeating many of the Report's and Memorandum's false legal and factual statements.  Nor did DOL and OIG invite Jefferson or his representative to participate in the press conference and to rebut the false charges and conclusions.  Nor did DOL and OIG disclose to the press that Jefferson had

20

denied the allegations and had reported to Harris that the Report and Memorandum contained many legal and factual errors.  Nor did DOL and OIG tell the press that they had deprived Jefferson of the full Report, notice of all the allegations against him, and an opportunity to be heard.

55.     The following day, *The Washington Post* and other publications, including the international media, published articles about Jefferson being forced to resign amid an OIG finding that Jefferson and his senior staff had committed legal and ethical violations.  *The Washington Post* published a number of claims in the Report that were demonstrably false.

56.     During this period DOL and/or OIG also provided a copy of the Report and Memorandum to Senator Claire McCaskill, Chair of the Homeland Security Subcommittee on Contracting Oversight ("**McCaskill**").  Upon information and belief, DOL and OIG did not disclose to McCaskill at the time that they gave her these documents that Jefferson, McWilliam, and Magdieli had all denied the Report's and Memorandum's conclusions; Jefferson and his lawyer had informed Harris and DOL that the Report and Memorandum contained material factual and legal errors; and that DOL and OIG had denied Jefferson notice of all of the allegations against him as well as his request for an opportunity to be heard and refute the Report and Memorandum.

57.     Further upon information and belief, Harris, Petrole, DOL, and OIG knew that McCaskill would further publicly disseminate the false legal and factual conclusions in the Report and Memorandum, because it was her practice to hold press conferences when presented with inspector general reports that were critical of public officials.  Sure enough, McCaskill did hold a press conference about the Report and Memorandum on or about July 28, 2011, further

publicizing the Report's and Memorandum's falsehoods.  And once again, the media published articles repeating these falsehoods.

### Additional Violations of Jefferson's Due Process Rights

58.     Beginning on July 27, 2011 and through early August, 2011, Jefferson's lawyer wrote and sent emails to DOL's legal counsel, Solicitor of Labor Patricia Smith ("Smith"), as well as to OIG and Petrole.  Jefferson's lawyer also met with Smith and another DOL official on or about August 8, 2011.  In these communications, Jefferson's lawyer requested a copy of the complete Report, which included all of the exhibits; permission to access Jefferson's emails, files, and other documents related to the Report; copy of the work product whose quality and value the Report questioned; and access to Jefferson's former staff and colleagues at DOL, including but not limited to McWilliam and Magdieli.  Although his meeting with Smith was off the record, Jefferson's lawyer also pointed out numerous factual and legal errors in the Report and requested an opportunity for Jefferson to be heard and to rebut them after receiving the requested materials.  Jefferson's lawyer repeated that Jefferson had a due process right to access the requested materials and relevant DOL persons so that Jefferson could rebut the legal and factual falsehoods and exonerate his name.

59.     DOL denied Jefferson's lawyer's requests' orally and in writing and affirmed the restrictions of the First Harris Memorandum.  Also during this period, Harris issued a second memorandum confirming Jefferson's resignation and affirming that the restrictions and conditions of the First Harris Memorandum would remain in effect until September 1, 2011 ("Second Harris Memorandum").  For its part, OIG informed Jefferson that it would treat his request for a complete Report and exhibits as a Freedom of Information Act ("FOIA") request.

Although OIG did provide an unredacted version of the Report, OIG has never provided Jefferson with a complete set of unredacted exhibits, which are an integral part of the Report.

60.     On August 31, 2011, Harris issued a memorandum ("Third Harris Memorandum") as DOL's response to the Report.  This Third Harris Memorandum repeated many of the Report's and Memorandum's legal and factual errors, and in effect ratified them. Harris and DOL prepared and issued the Third Harris Memorandum without informing Jefferson that they were doing so and without informing Jefferson of the date that they would finish and issue it.  Moreover, Harris and DOL denied Jefferson notice of the allegations made in the Third Harris Memorandum and any opportunity to be heard about its allegations prior to disseminating it publicly, which they did by posting it on the DOL website that same day.

61.     Upon information and belief, Harris and DOL purposely rushed to issue the Third Harris Memorandum the day before Jefferson could begin contacting his former DOL colleagues and start the process of clearing his name; DOL and Harris refused to allow Jefferson an opportunity to be heard and rebut the Report's and Memorandum's legal and factual errors prior to issuing the Third Harris Memorandum; and DOL and Harris failed to notify Jefferson of the allegations in the Third Harris Memorandum and provide him with an opportunity to be heard and rebut its conclusions prior to its public release—all in order to deprive Jefferson of his due process rights and an opportunity to clear his name.  In doing so, DOL and Harris subjected Jefferson to further public ridicule and deprivation of his due process rights.

### Financial and Emotional Toll on Jefferson

62.     Prior to assuming leadership of VETS, Jefferson's career had spanned the public and private sectors.  Jefferson had served as Hawaii's Deputy Director for the Department of

Business, Economic Development and Tourism; in the private sector as a consultant with McKinsey & Company; and as an Army officer.   Specifically, Jefferson led units in the Presidential Honor Guard, an Army Ranger battalion, and the Special Forces (Green Berets)— an A-team leader in the latter.  Jefferson was one of two recipients of the inaugural Harrison H. Schmitt Leadership Award from then-Secretary of State Colin Powell. Jefferson is also a Wounded Warrior, who lost his left hand in the line of duty while trying to protect his Special Forces teammates from a defective hand grenade detonating prematurely during a training exercise.

63.     Jefferson had never been accused of any impropriety in any prior position. Indeed, since his early days at West Point, he had staked his life and career on the creed of honor, duty, and service to his country.

64.     After resigning from VETS, Jefferson sought employment in the private sector and to resume his public speaking engagements.  Despite his extensive professional experience and his sterling academic credentials, Jefferson found it very difficult to obtain a job. Specifically, after many months of looking for work, Jefferson was offered a senior position at a large professional services firm.  But after completing several rounds of interviews, he was informed that he would not be hired because of the Report's findings of ethical and legal violations and the negative publicity and damage to his reputation that had ensued.  Later, Jefferson was offered a senior position at one of the largest executive search and training firms in the world.  But after a board member of the firm read about the Report from articles posted on the internet, the firm withdrew its offer of employment.   Similarly, Jefferson lost opportunities for lucrative public speaking engagements because of the Report's allegations of legal and ethical violations.

65.     On a personal level, Jefferson has had to bear the humiliation, anger, and depression from having his name and reputation ruined by OIG, Petrole, Cunningham, Russ, and Powell, who never informed Jefferson that he was the subject of an investigation or what the allegations were; never reported impeachment evidence that established Freeman's unreliability as witness, her FAR violations, and her history of making false statements about Jefferson and others; never disclosed that there was no objective evidence of Jefferson or his team saying or doing anything that could constitute pressure; knew that the direct-subcontracting that Jefferson had been accused of doing was widely practiced at DOL and had not been held to be unlawful or unethical by other inspectors general and courts; never investigated OASAM, the agency headed by a personal friend of Harris, despite finding that its senior officials had violated procurement laws; and never gave Jefferson a chance to review and rebut the false findings of the Report and Memorandum before publicizing them to the world.

66.     Jefferson also had to bear the frustration, anger, and shame from DOL and Harris purposely and repeatedly denying Jefferson an opportunity to be heard and refute the Report's and Memorandum's legal and factual errors before publicizing them—even after Jefferson told Harris that the Report was riddled with errors.  In fact, Jefferson had to endure the anger, frustration, and shame of the second highest official at the U.S. department charged with protecting workers blocking Jefferson from gaining access to his emails, records, and documents and from contacting his former colleagues—in order to thwart Jefferson from clearing his name prior to Harris and DOL publicly releasing the Report and Memorandum, and then prior to Harris and DOL publicly releasing the Third Harris Memorandum.

67.     Jefferson's reputation remains tarnished from the Report's, Memorandum's, and Third Harris Memorandum's false charges that he had committed legal and ethical violations,

charges that were purposefully disseminated throughout the world by Harris, Petrole, DOL, and OIG before giving Jefferson an opportunity to be heard and a chance to rebut them.

## CLAIMS

### Count 1 – Violations of the Administrative Procedure Act

(OIG, Petrole, Cunningham, Russ, and Powell)

68.    Jefferson incorporates by reference each and every preceding paragraph as if set forth fully herein.

69.    OIG, Petrole, Cunningham, Russ, and Powell acted arbitrarily and capriciously by violating the QSI, QSI-2003, Silver Book, OIG Manual including IN Number 8-1100, the ICP&P, Federal Rule of Evidence 803, and the Giglio Policy—all of which governed OIG, Petrole, Cunningham, Russ, and Powell at all times relevant to this Complaint.

70.    OIG, Petrole, Cunningham, Russ, and Powell wilfully and wantonly violated these rules and regulations, as well as acted arbitrarily and capriciously, by failing to conduct a full and fair investigation; by issuing a false and misleading Memorandum; by issuing a Report that was riddled with legal and factual errors, relied on hearsay, failed to disclose exculpatory evidence, failed to disclose impeachment evidence about the main witness and chief accuser's lack of credibility, and failed to identify any law that Jefferson allegedly violated; and by failing to provide Jefferson and McWilliam with notice that they were the targets of the investigation, of the accusations against them, and of their legal rights.

71.    OIG and Petrole further violated the Administrative Procedure Act by issuing OIG regulations and ordering OIG staff and investigators to follow OIG regulations that were at all relevant times unlawful because they had not been issued pursuant to notice and comment rulemaking as required by the APA.

**Count 2 – Violations of Due Process of Law**

(Harris, DOL, Petrole, Cunningham, Russ, Powell, and OIG)

72.     Jefferson incorporates by reference each and every preceding paragraph as if set forth fully herein.

73.     Jefferson was a political appointee, not a civil servant, and has no other adequate remedy to vindicate all of his rights, including seeking damages, other than to bring a lawsuit in federal district court.

74.     Jefferson's professional and personal reputation was injured by the flawed and incomplete investigation conducted by OIG, Petrole, Cunningham, Russ, and Powell, and by the legally and factually erroneous Report and Memorandum issued by them.

75.     In addition, Jefferson's professional and personal reputation was injured by the flawed and incomplete investigation conducted by DOL and Harris of the Report's and Memorandum's allegations and findings as well as by the Third Harris Memorandum, which purported to ratify the Report and Memorandum and repeated their legal and factual errors.

76.     Jefferson has a liberty interest in his good name and reputation and had a liberty interest in continuing his employment at DOL and continuing as an Assistant Secretary of Labor without being constructively discharged on false grounds.  Furthermore, Jefferson had a liberty interest in obtaining an employment position commensurate with his background, education, skills, and experience as well as his public persona.  Jefferson also had a liberty interest in obtaining public speaking engagements for compensation commensurate with his background, education, skills, and experience as well as his public persona.  These liberty interests are protected under the Due Process clause of the Fifth Amendment of the United States Constitution.

77.     DOL and OIG publicly disseminated the demonstrably false allegations and legally baseless conclusions contained in the Memorandum and Report by means of the internet, a joint press conference, and by submitting the false and misleading Report and Memorandum to McCaskill for further public dissemination.

78.     DOL, Harris, OIG, Petrole, Cunningham, Russ, and Powell failed to notify Jefferson of the full allegations, false conclusions, and legally and factually erroneous statements about him in the un-redacted Report and exhibits prior to disseminating the Report and Memorandum publicly.  Nor did DOL, Harris, OIG, Petrole, Cunningham, Russ, or Powell provide a meaningful opportunity for Jefferson to review the Report or to be heard about the Report and Memorandum prior to disseminating them publicly.  Nor did Harris and DOL provide a meaningful opportunity for Jefferson to review the Report or to be heard about the Report and Memorandum prior to constructively discharging Jefferson.

79.     Furthermore, DOL and Harris did all that they could to prevent Jefferson from receiving adequate notice and a meaningful opportunity to be heard regarding the false Report and Memorandum by imposing conditions in the First and Second Harris Memoranda that prohibited Jefferson from accessing information, documents, and DOL personnel to defend himself and exonerate his reputation.  In so doing, Harris and DOL unconstitutionally conditioned the benefit of Jefferson receiving a salary until August 31, 2011 and the benefit of Jefferson not being fired on the condition that Jefferson surrender his due process right to notice and a meaningful opportunity to be heard and defend himself against false charges.

80.     Furthermore, DOL, Harris, OIG, and Petrole continued to prevent Jefferson from having access to information, his records, and former DOL colleagues, prior to Harris

28

disseminating publicly the Third Harris Memorandum, which purported to corroborate the Report's and Memorandum's false findings and conclusions.

81.    Neither DOL nor Harris notified Jefferson of the allegations in the Third Harris Memorandum or provided him with an opportunity to be heard and rebut the legally and factually false statements contained in the Third Harris Memorandum prior to disseminating it publicly.  Harris and DOL deprived Jefferson of notice and an opportunity to be heard about the allegations in the Third Harris Memorandum, even though Jefferson and his attorney had told Harris that substantially similar allegations in the Report and Memorandum were false.  Again, Harris and DOL unconstitutionally conditioned the benefit of Jefferson receiving a salary through August 31, 2011 and the benefit of Jefferson not being fired on the condition that Jefferson surrender his due process right to notice and a meaningful opportunity to be heard by obtaining evidence necessary to defend himself against the false charges and allegations contained in the Third Harris Memorandum.

82.    Jefferson suffered economic damages—including loss of specific employment opportunities on two occasions; loss of other employment opportunities; loss of speaking engagements for compensation; and loss of his employment and income as an Assistant Secretary at DOL—that were proximately caused by DOL's, Harris's, OIG's, Petrole's, Cunningham's, Russ's, and Powell's actions and omissions.

**Count 3 – *Bivens* Claim Against Harris, Petrole, Cunningham, Russ, and Powell**

83.     Jefferson incorporates by reference each and every preceding paragraph as if set forth fully herein.

84.    Jefferson's professional and personal reputation was injured, and his employment was ended and his professional prospects harmed, by OIG and DOL, which are

federal agencies.  Jefferson has a right under the Due Process Clause of the Fifth Amendment of the U.S. Constitution to be notified of allegations against him of legal and ethical violations and a meaningful opportunity to be heard in order to address and refute such charges.

85.    Jefferson also has a liberty interest in his good name and reputation, in maintaining his employment and his Assistant Secretary position at DOL without being constructively discharged on false grounds, and in pursuing employment and public speaking engagements at compensation commensurate with his background and public persona—all of which are protected under the Due Process Clause of the Fifth Amendment of the United States Constitution.

86.    Jefferson's constitutionally protected rights under the Fifth Amendment's Due Process Clause were at all relevant times clearly established by numerous decisions by the U.S. Supreme Court and the federal trial and appellate courts of the District of Columbia as well as by the APA, IGA, and rules and regulations governing federal inspectors general as enumerated above, and were sufficiently clear that a reasonable federal official or employee in the position of Harris, Petrole, Cunningham, Russ, and Powell would have been aware of Jefferson's constitutional rights.

87.    Cunningham, Russ, and/or Powell conducted one or both interviews of Jefferson as part of the investigation conducted by OIG.  At all relevant times, Cunningham, Russ, and/or Powell were aware that Jefferson's professional reputation was or would be directly affected by the negative depictions and allegations of misconduct that Freeman had raised and that they were investigating.  Yet, Cunningham, Russ, and/or Powell failed to notify Jefferson of the allegations against him or even that he was a target of the allegations and of their investigation. Worse, Cunningham, Russ, and/or Powell went out of their way to use the wrong OIG form—

instead of the correct OIG form that is required for such targets of OIG investigations—so that targets will be informed of their rights and make an informed decision about whether or not to be interviewed.  Separate from twice giving Jefferson the wrong OIG form, Cunningham, Russ, and/or Powell did not otherwise inform Jefferson of his rights.  And in addition to depriving Jefferson of notice of the allegations and of his rights, Petrole, Cunningham, Russ, and/or Powell did not provide Jefferson with a meaningful opportunity to be heard and address the allegations of his misconduct, in violation of Jefferson's rights under the Due Process clause of the Fifth Amendment of the U.S. Constitution.

88.     Petrole and/or Cunningham at all relevant times negligently conducted and/or supervised an investigation of Jefferson that included the two interviews described in the preceding paragraph and, along with Russ and Powell, issued the Report and Memorandum that contained many legal and factual errors, material misstatements, and erroneous allegations and conclusions about Jefferson's alleged ethical and legal violations—all of which injured Jefferson and impugned his reputation for honesty and integrity.  These misstatements, depictions and allegations of misconduct, and false legal conclusions contained in the Report and Memorandum were demonstrably false and publicly disseminated on the internet and through the media.

89.     Harris and Petrole did not notify Jefferson of the full allegations and findings contained in the unredacted, complete Report (including exhibits) and did not provide Jefferson with a meaningful opportunity to be heard and correct the Report's and Memorandum's legal and factual errors, material misstatements, false depictions, and erroneous allegations of misconduct prior to holding (or causing DOL and OIG to hold) a press conference, posting the Report and Memorandum on the internet, and providing copies to McCaskill for further public

dissemination, in violation of Jefferson's rights under the Due Process Clause of the Fifth Amendment of the U.S. Constitution.

90.     Harris conducted an investigation in order to formulate DOL's response to the Report and Memorandum.  Harris did not seek any information from Jefferson, McWilliam, or Magdieli; did not notify them that he was conducting an investigation into the Report's and Memorandum's allegations, statements of fact, interpretations of law, and conclusions regarding Jefferson's alleged ethical and legal misconduct; and did not provide Jefferson (or McWilliam and Magdieli) with an opportunity to be heard and to refute the Report's and Memorandum's legal and factual errors.  Nor did Harris notify Jefferson of the allegations in the Third Harris Memorandum or provide a meaningful opportunity to be heard on them.  To the contrary, Harris barred Jefferson from having access to documents, emails, DOL colleagues, and other information prior to Harris issuing the Third Harris Memorandum so that Jefferson could not effectively formulate and submit to Harris and DOL—or disseminate publicly—an effective response and refutation of the legal and factual errors, conclusions, and other falsehoods contained in the Report and Memorandum in order to defend himself and his reputation.  Harris's issuing the Third Harris Memorandum and publicly disseminating it through the internet further injured Jefferson's reputation by repeating the Report's and Memorandum's legal and factual errors, false allegations, and false conclusions, and by adopting and otherwise purporting to ratify the Report and Memorandum.

91.     The acts and omissions of Harris, Petrole, Cunningham, Russ, and Powell, both individually and collectively, proximately caused Jefferson to be constructively discharged from his job as an Assistant Secretary of Labor on false grounds, to have a job offer rescinded, to lose another job that he would have received but for the Report and Memorandum and

resulting negative publicity, and to lose lucrative public speaking engagements—losses that violated Jefferson's Fifth Amendment liberty interest in retaining and pursuing his professional goals.  The acts and omissions of Harris, Petrole, Cunningham, Russ, and Powell also resulted in the loss to Jefferson of his legitimate expectation of income from and employment at DOL without loss due to a constructive discharge based on false grounds, as well as of his legitimate expectation of future income and employment and public speaking engagements commensurate with his education and professional experience, and therefore constituted a violation by Harris, Petrole, Cunningham, Russ, and Powell of Jefferson's Fifth Amendment property interest. Harris's Petrole's, Cunningham's, Russ's, and Powell's deprivation of Jefferson's liberty and property interests was without due process of law.

92.     Harris, Petrole, Cunningham, Russ, and Powell at all relevant times acted in their individual and/or official capacities with respect to the actions and omissions that gave rise to the violation of Jefferson's rights under the Due Process Clause of the Fifth Amendment of the U.S. Constitution as described above.  Furthermore, Harris, Petrole, Cunningham, Russ, and Powell violated and/or proximately caused the violation of Jefferson's constitutional rights as guaranteed under the Fifth Amendment of the U.S. Constitution.

93.     No statutory cause of action is available to Jefferson that provides monetary damages against Harris, Petrole, Cunningham, Russ, and Powell for violating his constitutional rights.

94.     Harris's Petrole's, Cunningham's, Russ's, and Powell's actions and omissions proximately caused injury to Jefferson.

### Count 4 – CIGIE's Due Process, IGA, and APA Violations

95.     Jefferson incorporates by reference each and every preceding paragraph as if set

forth fully herein.

96.     Out of an abundance of caution and in case a court rules that CIGIE provides

Jefferson with an administrative remedy and Jefferson must first bring some of his claims

against Petrole, Cunningham, Russ, and Powell before CIGIE in order to exhaust his

administrative remedies, Jefferson has filed a complaint against Petrole, Cunningham, Russ,

and Powell before CIGIE.

97.     However, Jefferson challenges the legality of CIGIE's rules (ICP&P) on their

face and as applied for violating the Due Process clause, the APA, and the IGA.

98.     CIGIE's ICP&P rules are arbitrary and capricious in that they do not provide for

an open and fair process and lack minimal procedural integrity, including protections against *ex

parte* communications, access to new evidence, opportunity to respond to an accused's answers

and briefs, and other procedural protections.  These rules are also arbitrary and capricious

because they allow CIGIE to dismiss meritorious claims without investigation, allow inspectors

general and their staffs to evade accountability even for negligence, and allow inspectors

general and their staffs to evade accountability once they stop working as an inspector general

or staff member.

99.     CIGIE and its Investigation Committee (which conducts investigations into

allegations of wrongdoing by inspectors general and their staffs) are "agencies" under the

Administrative Procedure Act (APA) and thus bound by APA notice and comment rulemaking

requirements when issuing their rules.  CIGIE and its organizational predecessor issued the

ICP&P, QSI, QSI-2003, and/or Silver Book without complying with these APA requirements.

As a result, CIGIE's and its Investigation Committee's procedures and the procedural

components of QSI, QSI-2003, and the Silver Book, fail to comply with the APA and fail to

34

provide Jefferson with adequate due process protections. Furthermore, investigations conducted, and reports and findings issued, under these rules and regulations are without legal bases since these rules were promulgated without complying with the APA's notice and comment rulemaking provisions.

100.    In addition, CIGIE is not an independent agency and does not provide full administrative review on the merits. Rather, CIGIE's adjudicative function is performed by an *ad hoc* group of other federal inspectors general that are appointed on a case-by-case basis, not by an independent and neutral body. These inspectors general individually and collectively have an inherent conflict of interest when adjudicating complaints. First, they know each other personally and work with each other professionally, and are therefore not neutral finders of fact or adjudicators when evaluating complaints against their co-inspectors general. They further have an inherent conflict of interest because any finding of fault against an inspector general or staff member will expose themselves and their staffs to similar liability, therefore providing a strong personal incentive not to create precedents that establish liability or wrongdoing.

101.    In addition, CIGIE does not provide adequate administrative review of agency (offices of inspectors general) action because CIGIE reviews only violations of law by individual inspectors general or staff members, not by an inspector general office. To the extent that the ICP&P require allegations against specific individuals instead of permitting administrative review of an inspector general office's actions or omissions as a whole, including investigations and reports, the ICP&P and CIGIE again violate the Due Process Clause, the APA, and the IGA.

102.    Relatedly, the ICP&P and CIGIE allow an inspector general or staff member to evade review and accountability if that inspector general or staff member leaves the office of

the inspector general prior to CIGIE issuing its conclusions.  In other words, once an inspector general or staff member learns of a credible complaint against him or her, he or she may avoid any accountability from CIGIE simply by leaving the office of inspector general.  In this case, Petrole is no longer the Acting Inspector General of DOL and has left OIG.  Thus, the ICP&P and CIGIE violate Jefferson's due process rights as well as the IGA, because they purport to deprive Jefferson of his right to administrative review by CIGIE of Petrole's abuses and errors for a reason other than a substantive lack of merit of Jefferson's claims.

103.    Moreover, the ICP&P and CIGIE violate the IGA because the IGA mandates that the Investigation Committee shall investigate "all allegations" and "any allegation" of wrongdoing.  But the ICP&P unlawfully establishes a "threshold standard" of review that constitutes an unlawful barrier that bars even meritorious claims based on negligence, mistaken facts, faulty legal determinations, and similar errors that may not rise to the level of individual misconduct or "willful and wanton" behavior.

104.    CIGIE and the ICP&P also violate the IGA's requirement that the Investigation Committee's "policies and procedures [be] necessary to ensure fairness and consistency" as well as the Due Process clause because: the threshold standard for review is unreasonably high and narrow; it imposes too high of an evidentiary burden on the complainant to obtain review; it does not afford meaningful appellate review of a false, faulty, or mistaken investigation or report, whether on the law or facts—even in cases of "negligence or wrongdoing"; it improperly requires a showing of criminal activity or "gross and wanton negligence" or "willful misconduct"—conduct that would at a minimum warrant punitive damages—simply to obtain a review by the Investigation Committee, thereby violating a complainant's due process rights to meaningful review; and it requires that a complaint must make a *prima facie* showing simply to

commence a review at the same standard that the claimant must meet to establish an actual violation.

105.    Moreover, the IGA's provision that "Investigations initiated under this subsection shall be conducted in accordance with the most current Quality Standards for Investigations" is an unconstitutional delegation by Congress of its legislative power.  It is unconstitutional because the QSI was not issued pursuant to notice and comment rulemaking in violation of the APA and is therefore without legal basis.  Furthermore, this delegation of power and authority by the IGA is unconstitutionally vague and indeterminate, since the QSI or similar regulations may change without notice or comment, and even potentially on a case-by-case basis.

106.    CIGIE and the ICP&P further violate the Due Process Clause and the IGA by denying full and fair access to review, because they allow an Investigating Committee to "direct that the case be closed," if the allegation does not rise to the level of "criminal violations or administrative misconduct, or other serious conduct, even if proven to be true."  In other words, CIGIE and the ICP&P provide no administrative review or remedy for negligence, ineptitude, false or baseless findings of fact, errors of law, and similar acts by an office of inspector general or its leadership and staff.

107.    Similarly, the substantive standard of misconduct set forth in the ICP&P is unconstitutionally narrow and does not afford a meaningful administrative remedy of arbitrary and capricious actions by offices of inspectors general, because the ICP&P does not afford a complainant the opportunity to correct an office of inspector general's false, faulty, mistaken, or misleading report; negligent investigation; or misapplication(s) of law and possibly failure to follow law, regulations or procedures.

108.    Procedurally, the ICP&P and CIGE are constitutionally defective because they do not provide Jefferson adequate due process protections, including: access to the full, unredacted record on which Petrole, Cunningham, Russ, and Powell purportedly relied, upon which the Report is purportedly based, which Cunningham, Russ, and Powell and OIG staff continue to deny Jefferson and his counsel, and to which Petrole, Cunningham, Russ, and Powell will have access when responding to Jefferson's CIGIE complaint; full and fair access to investigators and Investigation Committee decision-makers to the same extent afforded Petrole, Cunningham, Russ, and Powell and the OIG under the ICP&P; access to all Investigation Committee reports or decisions, including interim measures and decisions, as well as an opportunity to be heard on such interim decisions and measures before they are adopted by the Investigation Committee; protections against *ex parte* communications by Petrole, Cunningham, Russ, and Powell or by any other member of the OIG; notice of the identities of the proposed investigator(s) and decision-maker(s) and opportunity to move to recuse one or more of them for potential conflict of interest or other cause; opportunity to review Petrole's, Cunningham's, Russ's, and Powell's and OIG staff's answer(s) to Jefferson's allegations; opportunity to respond to Petrole's, Cunningham's, Russ's, and Powell's and the staff's answer(s); opportunity for oral argument; and fundamental access to information about the status and development of this case—many of which are afforded to Petrole, Cunningham, Russ, and Powell and OIG staff under the ICP&P.   These procedural flaws, lack of transparency, and fundamental lack of fairness fail to meet minimum standards of due process and to satisfy the IGA.

## PRAYER FOR RELIEF

**WHEREFORE**, Jefferson prays that this Court grant him the following relief:

(1)     Award Jefferson compensatory damages in an amount to be determined at trial, but not less than $5,000,000.00;

(2)     Award Jefferson punitive damages in an amount to be determined at trial;

(3)     Order DOL and OIG to remove from their respective websites the Report, Memorandum, and Third Harris Memorandum, and issue a public retraction of the material misstatements, legal and factual errors, and false allegations of legal and ethical violations contained in these documents, as set forth in this Complaint;

(4)     Order DOL and OIG to communicate to the public and to all federal agencies, the Congress, and the White House, that they retract the material misstatements, legal and factual errors, and false allegations of legal and ethical violations contained in the Report, Memorandum, and Third Harris Memorandum; that these three documents have been removed from their respective websites; and that Jefferson, McWilliam, and Magdieli have been exonerated of all charges and allegations of wrongful and unethical behavior contained in the Report, Memorandum, and Third Harris Memorandum;

(5)     Order DOL to remove any negative references in the employment records of Jefferson, McWilliam, and Magdieli with respect to their employment at DOL at all times relevant to this Complaint and to request that any other federal agency possessing employment records of Jefferson, McWilliam, and Magdieli do the same;

(6)     Order the Defendants to pay for a public relations firm to assist Jefferson for a three-year period to clear his name and repair the damage to his reputation, including assisting Jefferson with improving his internet profile and removing references to the false and negative statements contained in the Report, Memorandum, Third Harris Report, and DOL's, OIG's, and McCaskill's public statements related to the Report, Memorandum, Third Harris Memorandum and the allegations and false statements contained therein;

(7)     Order Defendants to cease and desist, and permanently enjoin Defendants, from making, issuing, and communicating any further statements that are harmful to Jefferson's reputation or that would likely have the effect of injuring Jefferson's reputation;

(8)     Award Jefferson attorney's fees, costs, pre- and post-judgment interest; and

(9)     Award Jefferson such other relief as this Court deems just and proper.

Respectfully submitted,

Peter C. Choharis
DC Bar No. 444787
Arnon D. Siegel
The Choharis Law Group, PLLC
1101 17th Street, NW
Suite 1220
Washington, DC 20036
202-777-2123 (tel)
choharis@choharisglobalsolutions.com

July 21, 2014