**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RAYMOND M. JEFFERSON,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 14-1247 (JEB)** |
| **SETH D. HARRIS,** *et al.*, | |
| **Defendants.** | |

## MEMORANDUM OPINION

"[F]or the citizen-critic of government[, i]t is as much his duty to criticize as it is the official's duty to administer." <u>N.Y. Times Co. v. Sullivan</u>, 376 U.S. 254, 282 (1964). But what obtains when the roles are mixed and it is the official's duty to play critic? For Plaintiff Raymond Jefferson, a former high-level appointee in the Department of Labor who believes himself the victim of an Inspector General's defamatory campaign, the governmental critic must be held to account. This is particularly so when, as alleged here, the critic's accusations were false and misleading, and were widely repeated in the national press.

Because Plaintiff knows he cannot sue the government directly in tort for libel – as such a claim would be statutorily barred – he has concocted a number of other causes of action grounded in the Constitution, the Administrative Procedure Act, and the Inspector General Act, all of which he now brings against the government and several officials. While he may have reason to feel knocked down and mistreated, he has, for the most part, failed to identify a colorable legal theory to support his suit. The Court will thus grant the bulk of Defendants' Motion to Dismiss, leaving only Plaintiff's due-process claim against the government to proceed.

1

## I.  Background

All facts are taken from Plaintiff's Amended Complaint – which the Court must presume to be true at this stage of the litigation – as well as documents referenced therein, such as official government reports and matters of public record.  The facts of this case chiefly cover a period of time in which Plaintiff served as Assistant Secretary of Labor for Veterans' Employment and Training Services (VETS), a "senior political" position he was appointed to fill by President Obama in 2009.  See Am. Compl., ¶¶ 6, 17, 25; Pres. Nomination No. 527, 111th Congress (2009-2010) (confirming Jefferson by voice vote on Aug. 7, 2009).

His central grievance concerns an investigation and resulting Report by the Department of Labor's Office of Inspector General (DOL-OIG), which "accused Jefferson . . . of legal and ethical violations" for allegedly pressuring a subordinate to steer contracts to three individuals "in violation of federal procurement rules," such as competitive-bidding requirements.  See Am. Compl., ¶¶ 24, 51.  Diving immediately into the details of that investigation and the Report, however, would be to start *in medias res*; a few background facts are important to give context to the dispute.  The Court has arranged them in chronological order as best it can – no small feat given the Amended Complaint's Faulknerian sense of time and consistent failure to assign even approximate dates to critical facts.

### A.  Jefferson's Work as Assistant Secretary

As Jefferson sees it, when he joined DOL in mid-2009, he inherited an office rife with "operational and management problems," which extended throughout VETS' organizational chart, including its nerve center for contract and procurement actions – the Office of Agency Management and Budget (OAMB).  Id., ¶ 17.  At the time, VETS' OAMB was led by Director Paul Briggs and Deputy Director Angela Freeman.  Id.  "In order to improve performance at VETS," Plaintiff believed it would be prudent to hire a handful of "renowned management

consultants and experts in leadership" from outside the government – namely, Stewart Liff, Ron Kaufman, and Mark Tribus. Id., ¶ 18. His objective was to have them carry out "organizational and program assessments, management reviews, and comprehensive training for all staff in order to increase performance, efficiency, and effectiveness." Id.

To accomplish this, he directed two of his subordinates – Deputy Assistant Secretary for VETS John McWilliam and Chief of Staff Amit Magdieli – to arrange for their hiring. Id. He told them to "act 'legally, ethically, but also quickly.'" Id., ¶ 19. Those two then turned to Freeman and Briggs in OAMB for help with "all contracting methods and decisions regarding hiring Liff and Kaufman." Id. According to Plaintiff, his involvement in the hiring process for the most part ended there; the bulk of the critical hiring actions were executed by others. See id., ¶ 25. In particular, he alleges that McWilliam and Magdieli oversaw the implementation of Jefferson's simple directive, and that Freeman and Briggs – in consultation with procurement officials in Labor's centralized procurement office, the Office of the Assistant Secretary for Administration and Management (OASAM) – took responsibility for the nuts and bolts of getting the consultants hired. See id., ¶¶ 20-21, 25-27.

Having thus set the stage, one would expect Plaintiff to turn next to the actual contracts that were the focus of the OIG's investigation. Unfortunately, he never clearly articulates how these three individuals came to be hired, despite titling a section of his Amended Complaint "The Three Contracts At Issue." Am. Compl. at 8. Notwithstanding the stream-of-consciousness narrative that ensues, the Court has attempted to piece together what happened by looking at the Complaint alongside the DOL-OIG Report and its Cover Memorandum.

As far as the Court can tell, the three consultants were "hired" in several different ways. Liff appears to have principally been hired via subcontracts with companies that had existing

contracts with either DOL or the Office of Personnel Management.  See Mot., Exh. A (DOL-OIG Report No. 14-1301-0002 IA) ("DOL-OIG Report") at 25-26; id. at 5-10; Am. Compl., ¶ 25.  Tribus appears to have been hired directly by DOL, although it does not seem that he was ever given a "contract" as that term is normally understood.  See Am. Compl, ¶ 27 ("Jefferson obtained written, pre-approval from DOL's legal counsel . . . for hiring and paying Tribus . . . .").  Instead, DOL arranged for him to be paid via credit card.  See DOL-OIG Rep. at 40-50 (describing paying Tribus by credit card on two occasions).  Finally, Kauffman was not ever "hired" at all.  On the contrary, according to the Report, the problem with Kaufman was that DOL received his services for free, even though DOL's prime contractor ended up having to improperly foot the bill.  See DOL-OIG Rep. at 38 (arguing that DOL "improper[ly] accept[ed]" services from Kaufman for free).

Whatever form they ultimately took, these personnel actions formed the basis of what came next – *viz.*, DOL-OIG's investigation and Report.  See Am. Compl., ¶¶ 24, 29-51 (complaining of the "Report's False Legal And Factual Conclusions").

B.  The DOL-OIG Investigation

According to Jefferson, the investigation was poisoned from the get go, since he believes it originated with two of his disgruntled charges in VETS' procurement and budget office (OAMB): Freeman and Briggs.  See id., ¶ 29.  The bad blood started, apparently, "after Jefferson and McWilliam disciplined Briggs and Freeman for poor performance and for making false statements."  Id., ¶ 28.  Thereafter, Freeman resigned from the agency, "[b]ut she did not go quietly."  Id.  She "filed three bogus Equal Employment Opportunity . . . claims against them that were quickly dismissed," and then proceeded to file "the OIG complaint at issue here."  Id., ¶ 29; see DOL-OIG Rep. at 4-5 ("Freeman said that she sent the anonymous complaint dated August 3, 2010, to the OIG hotline and added that she no longer wished to remain anonymous.").

4

Briggs also "alleged contractual improprieties" after being disciplined by Jefferson.  See Am.

Compl., ¶ 29; see DOL-OIG Rep. at 1 ("A separate complaint submitted by Fergus Paul

Briggs . . . , which referenced the same allegations [as Freeman's complaint] was received by the

OIG on September 21, 2010.").

        The investigation began shortly thereafter under the auspices of Acting Inspector General

Daniel Petrole.  See DOL-OIG Rep. at 4.  About a year later, and after having interviewed 22

individuals, Petrole issued the final investigative Report, which addressed five distinct

allegations of misconduct.  Id. at 1-4.  (The Report indicates that there are only four allegations,

despite rendering five different conclusions.  Id.)  The investigation substantiated three of the

allegations, partially substantiated one, and concluded that one was unsubstantiated:

| Number | Allegation | Conclusion |
|---|---|---|
| 1 | A/S [Assistant Secretary] Jefferson and DAS [Deputy Assistant Secretary] McWilliam abused their authority by giving Stewart Liff an advisory and assistance contract and coercing VETS employees into manipulating existing federal contracts in order to hire contractor Liff without the benefit of competition. | **Substantiated** |
| 2 | A/S Jefferson and DAS McWilliam accepted a gift from Ron Kaufman that exceeded $25 in value, in violation of 5 C.F.R. § 2635.202. | **Unsubstantiated** |
| [number omitted] | A/S Jefferson and DAS McWilliam improperly directed VETS employees to have DOL contractors hire Ron Kaufman without competition, and endorsed his products on the VETS intranet website. | **Substantiated** |
| 3 | A/S Jefferson's actions to obtain training services from an associate, Mark Tribus, led to the circumvention of procurement rules. | **Substantiated** |
| 4 | A/S Jefferson allowed . . . Liff to become involved in decisions affecting federal personnel including promotions, hiring, and terminations. | **Partially Substantiated** |

Id. at 1-2.

        Petrole attached to the Report a Cover Memorandum directed to Seth Harris, then-Deputy

Secretary of Labor, that summarized the findings.  See Mot., Exh. B (Cover Memorandum).  The

memo stated that "[t]he report describes a pattern of conduct by Assistant Secretary Jefferson,

and consequently by other senior VETS officials, which reflects a consistent disregard of federal

procurement rules and regulations, federal ethics principles, and the proper stewardship of appropriated dollars." Id. at 1.  The Memorandum clarified that although Jefferson himself did not necessarily violate procurement rules directly, it was his "insistence upon retaining the services of these [three] individuals [that] resulted in procurement violations by officials in both OASAM and VETS." Id. at 2.

Plaintiff maintains that the entire investigation – and thus the resulting Report – was riddled with flaws.  See Am. Compl., ¶¶ 29-50.  Among his grievances are that:

- OIG investigators failed to acknowledge that DOL procurement personnel were the ones responsible for "suggest[ing] and execut[ing]" many of the problematic contracting decisions, id., ¶ 30;
- The Report cites no "objective evidence" that he or his subordinate appointees (McWilliam and Magdieli) "pressur[ed] Freeman or anyone else to do anything" improper vis-à-vis the contracts at issue, id.;
- It was not Jefferson's legal responsibility, but rather OASAM's, to "ensur[e] that procurement rules [were] followed," id., ¶ 31;
- Freeman is responsible for any procurement misconduct regarding Kaufman because she "unlawfully approved the work on her own initiative and without authority," id., ¶ 32;
- Any procurement violation resulting from the payment of Tribus is not Plaintiff's fault because he received advance approval to pay Tribus from the Department's Deputy Solicitor, who also "twice informed [DOL-OIG] investigators . . . that Jefferson's actions were 'both legal and ethical,'" id., ¶ 33;
- The Report falsely states that "Liff and Kaufman were former colleagues of Jefferson at a consulting firm," thus suggesting Jefferson had nepotistic motives, when "Jefferson had never been a colleague of" either, id., ¶¶ 34-35;
- The investigators never notified Jefferson that he was the subject of the investigation or what the allegations were, id., ¶¶ 36, 39;
- The authors of the Report failed to disclose any impeachment evidence regarding Freeman's and Briggs's initial complaints, in violation of "the Giglio Policy," id., ¶¶ 40, 43, 46;[1]
- The authors offered no "objective basis for finding[]" that Jefferson violated various policies but "relied almost exclusively on Freeman's statements of feeling pressured by Jefferson to violate procurement rules without any corroborating testimonial or

---

[1] The Court presumes the "Giglio Policy" refers to the Department of Justice's policy regarding compliance with the Supreme Court's decision in Giglio v. United States, 405 U.S. 150 (1972), which concluded that the Due Process Clause requires prosecutors in a criminal case to disclose certain impeaching information about cooperating witnesses.  See Policy Regarding the Disclosure to Prosecutors of Potential Impeachment Information (Dec. 9, 1996), available at: http://www.justice.gov/ag/policy-regarding-disclosure-prosecutors-potential-impeachment-information-concerning-law.

documentary evidence," id., ¶ 41;

- The authors distorted witness testimony to make it seem like Plaintiff "ignored Magdieli's advice not to proceed" with certain contracts, id., ¶ 42;
- The authors committed legal errors by claiming various procurement actions were unlawful when, according to Jefferson, they were not, id., ¶¶ 44-45, 47;
- The Report provided no citations to legal authority to support its claims of unlawfulness and unethical behavior, id., ¶¶ 48-49, 51; and
- The authors invented a "knew or should have known" standard of fault to blame Jefferson for the contracting mishaps because they lacked direct evidence that he had pressured anyone to violate procurement rules or ethical policy restrictions.  Id., ¶ 50.

C.  Jefferson's Resignation and Publication of the Accusations

As the Court already noted, the DOL-OIG Report and Cover Memorandum were issued directly to Jefferson's boss, Deputy Secretary Harris, on July 21, 2011.  Id., ¶ 52.  The next day, Harris called Jefferson into his office and placed him on administrative leave without giving him a chance to read either document.  Id., ¶¶ 53-54.  Harris also prevented Jefferson from "accessing information and evidence with which he could refute the Memorandum's false charges" – for instance, by denying Jefferson access to his personnel records and banning him from contacting VETS staff.  Id., ¶¶ 53, 55 ("You . . . are not to use or access DOL-issued equipment; you are not to have any contact with VETS staff; and you are not to contact any of the parties who were involved in this matter.").  About a week later, however, Harris "gave Jefferson a redacted version of the Report," albeit without any of the exhibits.  Id., ¶ 56.

On July 26, 2011, Jefferson's attorney reached out to Harris to request the full, unredacted Report, informing him that "Jefferson had a right to review the entire record and be heard in order to refute the allegations."  Id., ¶ 57.  Harris responded that same day, "telling Jefferson that he had four hours in which to resign or be fired."  Id., ¶ 58.  He stated that if Plaintiff resigned, he would receive one month's severance, but that if he refused or failed to resign by close of business, he would be fired "immediately and without any severance pay."  Id. Although Jefferson's counsel asked for an additional day to review the redacted Report, Harris

declined.  Id., ¶ 59 ("Harris told Jefferson: 'You have no due process right!'").  Jefferson

submitted his resignation to the Secretary of Labor that afternoon.  Id., ¶ 61.

According to the Complaint, his ill treatment did not end there.  The very next day, DOL

and DOL-OIG held a joint press conference at which they "publicly disseminat[ed] the Report's

and Memorandum's false charges, errors of fact, and mistakes of law."  Id., ¶ 62.  The story was

picked up and reported by The Washington Post and other publications.  Id., ¶ 63.  The

government also sent the Report to Senator Claire McCaskill, then-Chair of the Homeland

Security Subcommittee on Contracting Oversight, who also held a press conference about the

investigation.  Id., ¶¶ 64-65.  Adding more salt to the wound, the media again picked up that

story and published the purportedly false charges.  Id., ¶ 65.

D.  Post-Resignation Name-Clearing Efforts

Right around the same time as the joint press conference, Jefferson and his lawyer

contacted DOL's lawyers in an effort to challenge the Report's conclusions.  Id., ¶ 66.  In a

meeting with the Solicitor of Labor, Plaintiff identified various deficiencies in the Report and

sought access to all materials necessary to exonerate himself, including an unredacted version of

the Report and its exhibits.  Id.  He was told by memorandum that he was still prohibited from

contacting VETS staff and accessing his files until September 1, 2011, and that the government

would treat his request for the full Report under the Freedom of Information Act.  See id., ¶¶ 67,

53.  He ultimately received the full Report, although not a full set of unredacted exhibits.  Id.,

¶ 67.

On August 31, 2011 – "the day before Jefferson could begin contacting his former DOL

colleagues and start the process of clearing his name" – Harris posted on DOL's website another

memorandum that "ratified many of the Report's and [Cover] Memorandum's legal and factual

errors."  Id., ¶¶ 68-69.  Jefferson claims he was given no notice that such a document was going

8

to be published and no opportunity to rebut it.  Id.

 Several years later, Jefferson sought to clear his name by another avenue.  On July 20, 2014, he filed a complaint with the Council of the Inspectors General on Integrity and Efficiency (CIGIE) against DOL-OIG and the relevant investigators for "violating OIG regulations, the [Inspector General Act], the APA, and Jefferson's due process rights by failing to conduct a full and fair investigation" and issuing a "legally and factually false" Report.  Id., ¶ 78.  Three months later, CIGIE's Integrity Committee issued a letter to Plaintiff indicating that it would take no action on the matter.  Id., ¶ 80.

 After his resignation, Jefferson "found it very difficult to obtain a job."  Id., ¶ 72.  In one instance, a company "terminated negotiations" with him for a senior leadership role when it learned of "the Report's findings of ethical and legal violations."  Id.  In another case, a large executive search and training firm rescinded an offer for him to serve in a senior position after a member of the firm's board read about the Report on the internet.  Id.  He also "lost opportunities for lucrative public speaking engagements" and had a "lucrative contract" rescinded for the same reason, id., ¶¶ 72, 77, and alleges he has suffered "humiliation, anger, and shame from having his name and reputation ruined."  Id., ¶ 73.

 E.  Procedural History

 Plaintiff filed suit in July 2014 and amended his Complaint in March 2015, setting forth four distinct counts.  Count I accuses DOL-OIG and the individual officers involved in the investigation – i.e., acting Inspector General Petrole and three subordinates, Asa Cunningham, David Russ, and James Powell – of violating the APA by disregarding various rules and regulations governing how OIG investigations are to be conducted.  Count II asserts that DOL, DOL-OIG, Harris, and the four individuals named in Count I violated his due-process rights by injuring his reputation, which could have been prevented had he been given a chance to fairly

rebut the Report's allegedly false conclusions.  Count III, which he brings against all individual

defendants (Harris, Petrole, Cunningham, Russ, and Powell), is a claim for damages flowing

from a Fifth Amendment tort violation under <u>Bivens v. Six Unknown Named Agents of Federal</u>

<u>Bureau of Narcotics</u>, 403 U.S. 388 (1971).  Last, Count IV consists of three different legal claims

– under the Inspector General Act, the APA, and the Fifth Amendment's Due Process Clause –

against CIGIE for various alleged shortcomings.

      In the early stages of this suit, Plaintiff also filed notice of a related case in this Court

brought by Stewart Liff against many of the same Defendants.  <u>See</u> ECF No. 3; <u>Liff v. Office of</u>

<u>the Inspector Gen., U.S. Dep't of Labor</u>, No. 14-1162 (filed July 10, 2014).  In January 2016, the

Court granted in part and denied in part the government's motion to dismiss in that case,

permitting Liff's due-process claims to proceed and declining to decide whether a <u>Bivens</u>

remedy was appropriate under the circumstances presented there.  <u>See Liff</u>, 2016 WL 107914, at

*9, 12 (D.D.C. Jan. 8, 2016).  Some of the same issues raised there also appear in this Opinion.

      One final note: the Court's Local Rules impose page limits for a reason, and the parties'

footnote-heavy briefs (particularly Plaintiff's Opposition) appear plainly calculated to

circumvent such limits.  Future pleadings in this format will be stricken.

## II.    Legal Standard

      In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's

factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be

derived from the facts alleged.'"  <u>Sparrow v. United Air Lines, Inc.</u>, 216 F.3d 1111, 1113 (D.C.

Cir. 2000) (quoting <u>Schuler v. United States</u>, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal

citation omitted); <u>see also</u> <u>Jerome Stevens Pharms., Inc. v. FDA</u>, 402 F.3d 1249, 1253 (D.C. Cir.

2005).  This standard governs the Court's considerations of Defendants' contentions under both

Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("[I]n

passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject

matter or for failure to state a cause of action, the allegations of the complaint should be

construed favorably to the pleader."); Walker v. Jones, 733 F.2d 923, 925–26 (D.C. Cir. 1984)

(same).  The Court need not accept as true, however, "'a legal conclusion couched as a factual

allegation,'" nor an inference unsupported by the facts set forth in the Complaint.  Trudeau v.

Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S.

265, 286 (1986)).

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff bears the burden of

proving that the Court has subject-matter jurisdiction to hear his claims.  See DaimlerChrysler

Corp. v. Cuno, 547 U.S. 332, 342 & n.3 (2006); Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir.

2015).  A court has an "affirmative obligation to ensure that it is acting within the scope of its

jurisdictional authority."  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d

9, 13 (D.D.C. 2001).  For this reason, "'the [p]laintiff's factual allegations in the complaint . . .

will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for

failure to state a claim."  Id. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal

Practice and Procedure § 1350 (2d ed. 1987)).  Additionally, unlike with a motion to dismiss

under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding

whether to grant a motion to dismiss for lack of jurisdiction."  Jerome Stevens Pharm., 402 F.3d

at 1253.

## III.    Analysis

Defendants move to dismiss Jefferson's Complaint in its entirety.  Finding it more logical

to address the counts somewhat out of order, the Court will first tackle Plaintiff's primary due-

process claim (Count II), move next to the <u>Bivens</u> question (Count III), proceed to the APA

claim brought against DOL, DOL-OIG, and the individual Defendants (Count I), and conclude

with the claims brought against CIGIE (Count IV).  The Court ultimately concludes that all but

Count II must be dismissed.

    A.  <u>Due-Process Violation (Count II)</u>

Although all of Plaintiff's Amended Complaint is saturated with language redolent of a

due-process claim, it is in Count II where he most plausibly alleges that his constitutional rights

were violated.  In brief: he complains that the government falsely accused him of legal and

ethical lapses, dragged his name through the mud, and failed to give him the chance to contest

the charges against him or adequately present a defense.  Those wrongs, in concert with the

added stigma brought on by his forced resignation, deprived him of a liberty interest in his

reputation, which he asserts is protected by the Fifth Amendment.

Before proceeding to the analysis, the Court notes that to the extent this count names

individuals, it presumes they are being sued in their <u>official</u> capacity, particularly since

Plaintiff's <u>Bivens</u> action in Count III is asserted against the same individuals and relies on the

same legal theory.  It will, accordingly, treat Count II as if it were brought only against the

agencies and entities themselves.  See <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985) ("[A]n

official-capacity suit is, in all respects other than name, to be treated as a suit against the

entity.").

In addition, although Plaintiff in his Opposition insists that Count II alleges both

substantive <u>and</u> procedural due-process violations, <u>see</u> Opp. at 26, the Amended Complaint

contains not a single suggestion that Jefferson intended to advance the former.  <u>See</u> Am. Compl.,

¶¶ 85-95.  Because he failed to plead such a theory there, the Court will not address it here.  <u>See</u>

<u>Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.</u>, 297 F. Supp. 2d 165, 170 (D.D.C.

2003) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.") (citation and internal quotation marks omitted).

1. *Reputation Plus vs. Stigma Plus*

"To state a claim for the denial of procedural due process, a plaintiff must allege that (1) the government deprived [him] of a '"liberty or property interest" to which [he] had a "legitimate claim of entitlement," and (2) that "the procedures attendant upon that deprivation were constitutionally [in]sufficient."'" New Vision Photography Program, Inc. v. Dist. of Columbia, 54 F. Supp. 3d 12, 28 (D.D.C. 2014) (quoting Roberts v. United States, 741 F.3d 152, 161 (D.C. Cir. 2014)).

Plaintiff argues that under longstanding Supreme Court precedent, he has a constitutionally protected liberty interest in his reputation, which was damaged when the government falsely accused him of procurement misconduct and forced him to resign. See Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 573 (1972) ("[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," that person's liberty interest is on the line, meaning that "notice and an opportunity to be heard are essential.") (quotations and citation omitted).

In this circuit, a plaintiff may avail himself of two different legal theories to establish a reputation-based due-process violation. See Hutchinson v. CIA, 393 F.3d 226, 231 (D.C. Cir. 2005). The first, commonly called a "reputation plus" claim, requires "the conjunction of official defamation and [an] adverse employment action." O'Donnell v. Barry, 148 F.3d 1126, 1140 (D.C. Cir. 1998). To plead such a claim, the plaintiff must meet three requirements. First, he must allege "that the government's defamation resulted in a harm to some interest beyond reputation," such as a "loss of present . . . government employment," Doe v. U.S. Dep't of

13

Justice, 753 F.2d 1092, 1111 (D.C. Cir. 1985), or a demotion in rank and pay.  See O'Donnell,

148 F.3d at 1140.  Second, he must "allege that the government has actually stigmatized his or

her reputation by, for example, charging [him] with dishonesty" or "unprofessional conduct."

Doe, 753 F.2d at 1111.  Third, he must plead facts indicating "that the stigma has hampered

future employment prospects."  Id.

His second option is to pursue what is known as a "stigma plus" theory.  This theory

"differs from the [reputation-plus theory] in that it does not depend on official speech, but on a

continuing stigma or disability arising from official action."  O'Donnell, 148 F.3d at 1140

(emphases added).  In other words, where a "reputation plus" theory requires some form of

defamatory or stigmatizing speech by the government, the latter depends only on governmental

imposition of "a continuing stigma or other disability arising from official action" that

"foreclosed the plaintiff's freedom to take advantage of other employment opportunities."  Id.

(internal quotation marks and brackets omitted).

Although Plaintiff advances both theories, he has adequately pled only the former – that

is, (1) an adverse employment action, such as involuntary loss of government employment, (2) a

stigmatizing or defamatory act by the government closely connected with that adverse action,

and (3) a "hamper[ing]" of his subsequent employment prospects.  See Doe, 753 F.2d at 1111-12

(denying government's motion to dismiss where plaintiff alleged she "was discharged on the

basis of allegations of unprofessional conduct and dishonesty, and the charges were allegedly

disseminated to prospective employers, public and private").

Jefferson has not, conversely, made out a claim under a stigma-plus theory.  "Under this

line of cases, a government action that potentially constrains future employment opportunities

must involve a tangible change in status."  Kartseva v. Dep't of State, 37 F.3d 1524, 1527 (D.C.

Cir. 1994).  Such a change may be shown in one of two ways.  The first is if the government's

actions "formally or automatically exclude[d]" Plaintiff from future government employment

opportunities – *e.g.*, by making "a binding determination to disqualify" him from further

employment.  Id. at 1528-29.  Plaintiff's Complaint contains no such claim, so he must rely on

the second path: alleging that even if the government did not make a <u>formal</u> disqualification, its

actions nevertheless had the "broad effect of largely precluding [him] from pursuing [his] chosen

career," <u>id.</u> at 1528 – meaning that "his ability to pursue his chosen profession has been

'seriously affected, if not destroyed.'" <u>O'Donnell</u>, 148 F.3d at 1141-42 (quoting <u>Kartseva</u>, 37

F.3d at 1529).

      Here, too, Jefferson's Complaint falls short.  He proclaims that he has "found it very

difficult to obtain a job," Am. Compl., ¶ 72, but he does not allege that he has been broadly

precluded from working in his field.  Even though his allegations suffice to show some

"hampering" of his employment prospects, his episodic anecdotes of having had one job offer

revoked, having final negotiations terminated in another, and losing a handful of public-speaking

opportunities are insufficient to show broad preclusion from continuing his career.  <u>See</u> <u>Kartseva</u>,

37 F.3d at 1529 ("[I]f [the plaintiff] has merely lost one position in her profession but is not

foreclosed from reentering the field, she has not carried her burden . . . ."); <u>Taylor v. Resolution</u>

<u>Trust Corp.</u>, 56 F.3d 1497, 1506 (D.C. Cir. 1995) ("[P]laintiff may demonstrate that the

government's action precludes him . . . from such a broad range of opportunities that it interferes

with [his] constitutionally protected right to follow a chosen trade or profession.") (internal

quotations and citation omitted).

      Although the reputation-plus claim, unlike the stigma-plus one, may be facially

sufficient, the government nonetheless offers a series of arguments challenging its validity.  The

Court now takes those up.

2.   *FTCA Defense*

Just as it argued in Liff, 2016 WL 107914, at \*5, the government first insists that Count II must be dismissed because it is really just a defamation claim masquerading as a constitutional one.  See Mot. at 10.  The argument goes like this: because Count II involves allegations of defamation, it must in fact be a defamation claim, and therefore it may only properly be pled under the Federal Tort Claims Act, the statute governing all tort claims lodged against the federal government.  See 28 U.S.C. § 2671 *et seq*.  But because the FTCA specifically precludes the bringing of defamation claims against the government, see id. § 2680(h), Plaintiff's count cannot survive.

Tidy as it is, this syllogism is built on a shaky foundation, for it presumes that just because Plaintiff's claim possesses some of the same characteristics of a defamation claim, it must by necessity be a defamation claim.  As the Court observed in Liff, this argument might hold water if Jefferson had "limited [his] Complaint to seeking damages resulting from 'defamation by the government . . . alone,' . . . .  But the allegations in the Complaint allege more than just defamation . . . . [a]nd [Plaintiff] seek[s] more than just monetary relief for past harms – namely, a wide range of injunctive remedies."  Liff, 2016 WL 107914, at \*5 (quoting Paul v. Davis, 424 U.S. 693, 701 (1976)).  In attacking not only the defamatory statements themselves, but also his loss of employment and the inadequacy of the procedural protections available for challenging the accusations levied against him, Plaintiff makes clear that he is not simply relying on artful pleading to constitutionalize a simple tort claim.  Just as the Court concluded in Liff, this defense falls flat.

3.  *Failure to State a Claim*

The government next argues that because Jefferson was not fired, but rather resigned, it owed him no procedural protections.  Specifically, it insists that any resignation, even an involuntary one, does not count as an "adverse action" for the first element of a reputation-plus due-process claim.  In the alternative, it argues that even if an involuntary termination (or "constructive discharge") satisfies the adverse-action requirements, Jefferson's resignation was voluntary.  The Court considers both contentions below.

a.  Constructive Discharge as Adverse Action

The government's first argument is that a resignation – even if involuntary – is not an "adverse action" under the <u>Roth</u> line of due-process cases.  <u>See</u> Mot. at 14.  In support of this position, the government relies almost exclusively on <u>Evans v. Dist. of Columbia</u>, 391 F. Supp. 2d 160 (D.D.C. 2005), a reputation-plus case in which an employee's resignation, obtained under threat of termination, was deemed to have vitiated any liberty interest he may have had in his reputation.  <u>Id.</u> at 168.  The court there reasoned that "a forced resignation is not enough to make out a liberty interest claim" because, as a matter of law, the stigma stemming from "resignation from one's position, even under the threat of termination . . . does not have so negative an effect on future employment opportunities as to raise due process concerns."  <u>Id.</u> at 167-68.

This Court is not inclined to follow <u>Evans</u>.  As an initial matter, <u>Evans</u> correctly acknowledged that "[the D.C.] [C]ircuit appears never to have held squarely that a constructive discharge or forced resignation is an insufficient basis" for such a claim.  <u>Id.</u> at 168.  Indeed, the three D.C. Circuit cases <u>Evans</u> cited as supporting its conclusion all dealt with direct terminations or demotions, and thus none had occasion to decide whether there might be circumstances under which a constructive discharge might also suffice.  <u>See</u> <u>O'Donnell</u>, 148 F.3d

at 1140 (demotion); <u>Orange v. Dist. of Columbia</u>, 59 F.3d 1267, 1274 (D.C. Cir. 1995)

(termination); <u>U.S. Info. Agency v. Krc</u>, 905 F.2d 389, 397 (D.C. Cir. 1990) (termination).

More important, however, is that the facts alleged here illustrate that a constructive

discharge may, in some circumstances, be as stigmatizing as an actual, "official" termination.  As

a reminder, DOL-OIG issued the Report to Harris on July 21, 2011.  <u>See</u> Am. Compl., ¶ 52.

Harris placed Jefferson on administrative the next day and then asked for his resignation on July

26.  <u>Id.</u>, ¶¶ 53, 57-58.  On July 27, DOL and DOL-OIG held their joint press conference at which

they "publicly disseminat[ed] the Report's and Memorandum's false charges, errors of fact, and

mistakes of law."  <u>Id.</u>, ¶ 62.  Senator McCaskill held another press conference on the matter the

following day.  <u>Id.</u>, ¶ 65.  About a month later, Harris publicly posted a memorandum

"ratif[ying]" the Report's conclusions and confirming that Jefferson had violated government

ethics standards and procurement rules.  <u>Id.</u>, ¶¶ 68-69.  In sum, the government's sharp

accusations, issued both shortly before and after Jefferson's swift exit, leave the distinct

impression that he was pushed out because of the alleged misconduct.  While there may be

circumstances in which a resigning official may plausibly imply, "'I wasn't fired; I quit to return

to my career in private life,'" <u>Graehling v. Vill. of Lombard, Ill.</u>, 58 F.3d 295, 297 (7th Cir.

1995), this does not appear to be one of them.  The Court thus cannot conclude, as a matter of

law, that the stain of governmental opprobrium is always lifted where a plaintiff has a hand in his

own removal.

The notion that involuntary resignation cannot constitute an adverse action for due-

process purposes also stands in tension with this circuit's doctrine of constructive discharge,

which permits an employee who "cannot show that she was actually terminated" – for purposes

of constitutional or federal statutory violations – to demonstrate that because her "resignation . . .

18

was involuntary, [it] was effectively a termination." Keyes v. Dist. of Columbia, 372 F.3d 434,

438 (D.C. Cir. 2004); accord Aliotta v. Bair, 614 F.3d 556, 566 (D.C. Cir. 2010) ("[T]he doctrine

of constructive discharge enables an employee to overcome the presumption of voluntariness [of

a resignation] and demonstrate she suffered an adverse employment action by showing the

resignation or retirement was, in fact, not voluntary.") (emphasis added).  Particularly important

is that, in Keyes, establishing an "adverse action" was essential to plaintiff's statutory and

constitutional claims, including a deprivation of a liberty interest under the Due Process Clause.

See 372 F.3d at 437.  Although the court ultimately agreed with the district court that, on the

summary-judgment record before it, Keyes had failed to adduce evidence of involuntary

separation, it nevertheless pointed out that, as a general matter, proof of involuntariness would

permit the liability question to be put to a jury.  See id. at 438.

Finally, the Court notes that the only circuit court to have squarely addressed the issue

held that an involuntary termination would count as an adverse action, provided the plaintiff

could prove the requisite elements of a constructive discharge.  See Hill v. Borough of Kutztown,

455 F.3d 225, 233 n.10 (3d Cir. 2006) ("[A] resignation will be deemed involuntary (i.e., deemed

a constructive discharge) and will thus trigger the protections of the due process clause . . . under

only two circumstances: (1) when the employer forces the employee's resignation or retirement

by coercion or duress, or (2) when the employer obtains the resignation or retirement by

deceiving or misrepresenting a material fact to the employee.").

This Court thus concludes that the mere fact that Jefferson resigned does not preclude his

bringing a due-process claim.  Because "resignations . . . are presumed to be voluntary,"

however, Aliotta, 614 F.3d at 566, he must also allege facts sufficient to establish that his

resignation was, in fact, involuntary, and thus "effectively a termination." Keyes, 372 F.3d at

438.  It is this question that the Court now addresses.

> b.  Involuntary Resignation

The government next argues that notwithstanding the four-hour timeframe that Jefferson was given to make his decision, he still had a choice: resign or be fired.  He chose the former, and given that he admits he conferred with counsel, Defendants maintain that his choice to resign was knowing and voluntary.  See Mot. at 14.

A federal plaintiff generally has two options for establishing an involuntary resignation: "(1) that the resignation . . . was the product of misinformation or deception by the agency; [or] (2) that the resignation . . . was the product of coercion by the agency." Staats v. U.S. Postal Serv., 99 F.3d 1120, 1124 (Fed. Cir. 1996); see Aliotta, 614 F.3d at 567 (stating in less clear language that a plaintiff may prove involuntariness by both avenues).  Only the latter is plausibly alleged by Jefferson, and so the Court will limit its focus accordingly.

A plaintiff seeking to establish an involuntary resignation on the basis of coercion must allege that: "[1] [the] agency impose[d] the terms of an employee's resignation, [2] the employee's circumstances permit[ted] no alternative but to accept, and [3] those circumstances were the result of improper acts of the agency." Keyes, 372 F.3d at 439; see also Stone v. Univ. of Maryland Med. Sys. Corp., 855 F.2d 167, 174 (4th Cir. 1988) (adding as relevant factor "whether [the employee] was permitted to select the effective date of resignation").  It is true that "'[w]here an employee is faced merely with the unpleasant alternatives of resigning or being subject to removal for cause, such limited choices do not make the resulting resignation an involuntary act.'" Keyes, 372 F.3d at 439 (quoting Schultz v. U.S. Navy, 810 F.2d 1133, 1136 (Fed. Cir. 1987)).  "On the other hand, inherent in that proposition is that the agency has reasonable grounds for threatening to take an adverse action.  If an employee can show that the

agency knew that the reason for the threatened removal could not be substantiated, the threatened action by the agency is purely coercive."  Schultz, 810 F.2d at 1136.

The Court concludes that Jefferson's allegations suffice at this stage to state a claim for coercive, involuntary termination.  Several essential facts from the Complaint illustrate that the circumstances surrounding his departure permitted only one reasonable option, and that Jefferson maintains that the Agency had no legitimate basis for demanding his resignation.

First is that, in contrast with the vast majority of other scenarios involving a claimed involuntary discharge, Jefferson's "choice" between resignation and discharge was effectively no choice at all.  Specifically, his status as a political appointee meant that he was not entitled to any of the pre- or post-termination procedural protections enjoyed by the bulk of civil servants under Chapter 75 of the Civil Service Reform Act.  See United States v. Fausto, 484 U.S. 439, 447 (1988).  For example, CSRA-covered employees faced with a proposed for-cause termination receive notice and may challenge such an action before an impartial tribunal.  See 5 U.S.C. § 7513(b) (before being terminated, covered employee entitled to 30-days notice, a minimum of 7 days in which to provide evidence and argument contesting the termination, and a written decision, among other protections).  With those individuals, the choice between resignation and the prospect of for-cause removal is undeniably an unpleasant one, but there is a meaningful choice nonetheless.

Jefferson, conversely, had no recourse to such statutory protections.  As the government itself vehemently argues, "Because the plaintiff was a member of the excepted service under the [CSRA]," and thus not entitled to Chapter 75's procedural guarantees, "he could be dismissed without cause, without prior notice, without a termination hearing, and without an opportunity to appeal the decision."  Mot. at 18.  As a result, he could not simply "stand pat and fight" the

agency's proposed termination, <u>Christie v. United States</u>, 518 F.2d 584, 588 (Ct. Cl. 1975), for

he was not entitled to contest it at all.  In other words, there was no upside to his choosing

termination over resignation.  Furthermore, even if he had had the ability to complain, post-

termination, to the Merit Systems Protection Board's Office of Special Counsel – a remedy that

will be discussed in greater detail *infra* at Section III.B.2 – he would have had that option

whether he resigned or was fired.

To make matters worse, Jefferson was only given four hours to pick his poison.  <u>See</u>

<u>Perlman v. United States</u>, 490 F.2d 928, 932-33 (Ct. Cl. 1974) (pre-CSRA case finding

retirement involuntary when plaintiff given several hours to choose between retirement and

being subject to reduction in force).  He also lacked a complete picture of the allegations against

him.  Upon his suspension, he was denied all access to the Report and then, shortly before his

resignation, he was given a redacted version without a complete set of its accompanying exhibits.

<u>See</u> Am. Compl., ¶ 67.  He was also denied the ability to develop and present any evidence to the

agency, both during his pre-resignation suspension and in the short window he was given to

decide whether to resign.  <u>See</u> <u>id.</u>, ¶ 54.  Harris even prohibited him from speaking to employees

who might corroborate his account of events until the day <u>after</u> his resignation.  <u>See</u> <u>id.</u>, ¶¶ 53,

67.

Finally, Jefferson has alleged that the government knew or should have known that the

reasons underlying his termination were unsubstantiated.  <u>See</u> <u>Schultz</u>, 810 F.2d at 1136 ("If an

employee can show that the agency knew that the reason for the threatened removal could not be

substantiated, the threatened action by the agency is purely coercive"). He alleges, for instance,

that the investigators deliberately withheld impeachment evidence about biased witnesses who

spoke out against him and that they "distorted" certain witness testimony in the Report to make it

appear more damning.  See Am. Compl., ¶¶ 40, 42.  In addition, his allegations that Harris

deliberately prevented him from accessing exculpatory information, including access to

government witnesses, also suggests that the Agency was willing to proceed in its chosen course

regardless of whether Jefferson might be able to clear his name.  Plaintiff has thus set forth

sufficient facts that, if proven, could plausibly establish that he stepped down against his will.

### 4.  *Political Question*

Defendants next argue that even if Jefferson's resignation does not doom his claim, the

count must be dismissed as a non-justiciable political question.  See Mot. at 15-18.  This

objection requires only slight attention.  Were Jefferson simply complaining of his separation in

the form of a wrongful-termination suit and seeking reinstatement as a remedy, Defendants'

position would merit greater analysis, as it would be plain that he desired judicial review of

DOL's political decision to remove a Presidential appointee.  See Free Enter. Fund v. Pub. Co.

Accounting Oversight Bd., 561 U.S. 477, 509 (2010) ("Under the traditional default rule,

removal is incident to the power of appointment.").  That is not the case here, where Plaintiff

instead demands an opportunity to clear his name.  See Codd v. Velger, 429 U.S. 624, 627

(1977) ("Assuming all of the other elements necessary to make out a claim of stigmatization . . . ,

the remedy mandated by the Due Process Clause . . . is 'an opportunity to refute the charge.'")

(quoting Roth, 408 U.S. at 573).

More problematic for Defendants is that the D.C. Circuit addressed this issue in Doe v.

U.S. Dep't of Justice, 753 F.2d 1092 (D.C. Cir. 1985), and declined to find the question

nonjusticiable over the objections of a dissent.  The plaintiff in Doe was an excepted-service

attorney for the Justice Department who claimed the government had harmed her reputation by

accusing her of dishonesty and unprofessional conduct and then discharging her.  See 753 F.2d at

1097-98.  In concluding that the plaintiff had adequately pled a "reputation plus" due-process

claim, the court decoupled the question of the plaintiff's liberty interest in her reputation from

whether she enjoyed (or lacked) any protected property right in her appointment.  "The liberty

clause," it explained, in contrast to the property clause, "protects reputation, not job tenure, in the

government employment context."  Id. at 1108 n.15.

On account of those distinctions, even though the plaintiff "enjoyed no statutory

entitlement to her position with the Department," and the government was under no obligation to

give her procedural protections "in its actual decision to terminate" her, id. at 1100 (emphasis

added), she was still entitled to "an opportunity . . . to refute the charges [against her] and clear

her name."  Id. at 1112; see id. at 1106 ("[T]he combination of government defamation

plus . . . the discharge of a government employee states a liberty interest claim even if the

discharge itself deprives the employee of no property interest protected by the fifth or fourteenth

amendments.").  To argue, as the Government does here, that "Plaintiff had no due process rights

vis-à-vis his presidentially-appointed position," Mot. at 27, is to answer only the property-

interest question.  Because Plaintiff does not to undo his discharge, this objection carries no

weight here.

Relevant, too, is that the dissent in Doe expressly argued that forcing the government to

undertake a name-clearing hearing in such circumstances would require courts to interfere with

sensitive political questions better addressed by Congress and the Executive.  See id. at 1127

(MacKinnon, J., dissenting in part) ("[T]he court should defer here to Congress' judgment that

liberty interests—which do require some statutory support—should not be deemed to vest in

certain jobs in the Executive.").  The majority nevertheless rejected this line of argument,

concluding that even though some government employees may be dismissed for no reason at all,

there is "nothing paradoxical in the [parallel] conclusion that the government should afford discharged employees a bare opportunity to be heard when it slanders their professional reputation and effectively forecloses future employment opportunities." Doe, 753 F.2d at 1112 n.21; see also id. at 1114 ("[T]he administrative burdens involved in a post-termination [name-clearing] hearing do not in any way interfere with the Department's employment decisions.").

5. *Adequate Process*

Defendants also maintain that even if Plaintiff's liberty interest were at stake, he received all the process he was owed under the Constitution because he was given the opportunity to explain himself during the DOL-OIG investigation. See Mot. at 15; Reply at 5-6. The fact that some process was afforded him during the initial stages of the investigation does not obviate the need for additional process further down the line. If, as Jefferson insists, the Report's legal conclusions were incorrect, see Am. Compl., ¶ 45 (insisting that behavior described in Report was "not unlawful"), it would seem obvious that additional protections were required – *viz.*, an opportunity to clear his name – if the government did, in fact, constructively discharge him and impose a stigma on his reputation. See McCormick v. Dist. of Columbia, 899 F. Supp. 2d 59, 68 (D.D.C. 2012) (adequate process in context of plaintiff's liberty interest requires determining "only whether [the plaintiff] received adequate process before the [defamatory] allegations became indelibly attached to his record").

Jefferson alleges, moreover, that the investigators did not inform him that he was in any way the subject of the investigation, which he contends affected his motivation and ability "to provide a full and accurate account of how all of the contracts took place, who was responsible for various actions and decisions, and what their precise role was in the three contracts." Am. Compl., ¶ 37. He also asserts that in certain instances, DOL-OIG relied on a single witness for

conclusions – such as Freeman's "feeling pressured by Jefferson to violate procurement rules" –
but without providing "any corroborating testimonial or documentary evidence," and without
disclosing information that might have undermined the credibility of that witness.  See id., ¶ 41.

In essence, the Complaint makes clear that it was only when Jefferson was able to review
the Report itself that he could understand and respond to what he believes are its significant
flaws and misleading presentations of evidence.  The Court thus cannot say at this early stage of
litigation that because he was given the chance to tell his own story during the DOL-OIG
interview, he was, as a matter of law, given all the process that was due.  See, e.g., Old
Dominion Dairy Products, Inc. v. Sec'y of Def., 631 F.2d 953, 968 (D.C. Cir. 1980) (adequate
process for protecting liberty interest "includes the right to be notified of the specific charges
concerning the [plaintiff] contractor's alleged lack of integrity, so as to afford the contractor the
opportunity to respond to and attempt to persuade the contracting officer, in whatever time is
available, that the allegations are without merit").

6. *No Money Damages*

Last, Defendants argue that because Plaintiff seeks money damages in his prayer for
relief, and because sovereign immunity bars such relief against the federal government, Count II
must be dismissed.  See Mot. at 19.  But this position ignores that Plaintiff also seeks prospective
relief to ameliorate the harm done to his reputation.  See Am. Compl. at 44-46.  That he
improperly seeks money damages in addition to injunctive relief does not bar his claim.

B.  Bivens Action Against Individuals (Count III)

Incorporating the same theory underlying his due-process claim against the government,
Jefferson also seeks damages from the individual officers who caused him harm.  Count III is
tethered to the Supreme Court's 1971 Bivens case, in which the "Court recognized an implied
private action, directly under the Constitution, for damages against federal officials alleged to

have violated a citizen's Fourth Amendment rights."  Meshal v. Higgenbotham, 804 F.3d 417,

420 (D.C. Cir. 2015).

Defendants raise three challenges to such a cause of action.  First, they contend that

because Bivens claims "borrow" the statute of limitations from the most closely related state-tort

law – here, a one-year limitations period for defamation under D.C. law – Jefferson's action is

untimely.  Second, they maintain that a Bivens remedy should not be recognized when a

comprehensive remedial scheme – namely, the CSRA – exists as the exclusive remedy for

disputes arising from employee-employer relationships.  Third, they argue that the individual

Defendants are entitled to qualified immunity.  Because the Court agrees with Defendants' first

two arguments, it need not reach the last.

### 1.  *Statute of Limitations*

In supporting their limitations position, Defendants reason as follows: The claim accrued

at the latest on August 31, 2011 (when Harris issued his follow-up memorandum), but Plaintiff

did not file suit until July 21, 2014; because the District of Columbia's one-year bar on

defamation actions governs this claim, see Doe 753 F.2d at 1114 (applying District's one-year

limitations period for defamation to plaintiff's Bivens claim), it is time barred.  See Mot. at 20-

21 (citing D.C. Code § 12-301(4)).  Plaintiff does not dispute that if the one-year limitations

period applies, Count III is untimely.  See Opp. at 35 n.21.  Instead, he counters that Doe relied

on the wrong limitations period – it should have used the generic (or "residual") three-year

limitations period for tort actions – and, in any event, a more recent Supreme Court case

implicitly overruled the holding in Doe.  See id. at 35-36.  Although this Court was presented

with this question in Liff, it found no need to grapple with Doe's precise holding; this was

because Doe's limitations ruling was specific to "reputation plus" claims, whereas Liff presented

only "stigma plus" claims, which do not require proof of governmental defamation.  See Liff, 2016 WL 107914, at *7-9; O'Donnell, 148 F.3d at 1140 (stigma-plus theory "differs from the [reputation-plus theory] in that it does not depend on official speech").  As a result, where the Court found no need to resolve the question in Liff, it cannot elude it here.

Where "there is no federal statute of limitations expressly applicable to" a given federal claim, courts generally "'borrow' the most suitable statute or other rule of timeliness from some other source," which typically is "the most closely analogous" state-law timeliness rule. DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 158 (1983).  Such "borrowing" is appropriate whether the civil remedy was crafted by the legislature or, as in a Bivens action, implied directly from the Constitution.  See Doe, 753 F.2d at 1114.

In Doe – a "reputation plus" case like this one – the D.C. Circuit "borrowed" the District of Columbia's one-year limitations period for defamation actions, reasoning that where defamatory statements were central to that plaintiff's constitutional damages claim, there was little difference between it and a regular defamation claim under state tort law.  See id. ("We can discern no difference in the practicalities of [litigating] or the [substantive] policies behind a Bivens action for the deprivation of a liberty interest in reputation and an ordinary defamation claim.").

Four years later, the Supreme Court in Owens v. Okure, 488 U.S. 235 (1989), addressed an inconsistency problem that had arisen in lower courts' application of the "borrowing" rule in a nearly identical context: actions under 42 U.S.C. § 1983 for deprivations of constitutional rights by state actors.  In Owens, the Court noted:

> Some courts found analogies in common-law tort, others in contract law, and still others in statutory law.  Often the result had less to do with the general nature of § 1983 relief than with counsel's artful pleading . . . .  Consequently, plaintiffs and defendants often had no

> idea whether a federal civil rights claim was barred until a court
> ruled on their case.  Predictability, a primary goal of statutes of
> limitations, was thereby frustrated.

Id. at 240 (footnote omitted).  Part of the confusion, the Court noted, was that constitutional tort

claims "have no precise state-law analog."  Id. at 249.  As a result, certain state-law causes of

action, like intentional torts, were "particularly inapposite" given the "wide spectrum of claims

which § 1983 has come to span."  Id.  To remedy pervasive inconsistencies in the courts'

application of the "borrowing" rule, the Court held that "where state law provides multiple

statutes of limitations for personal injury actions, courts considering § 1983 claims should

borrow the general or residual statute for personal injury actions."  Id. at 249-50.

Pointing to Owens, Plaintiff argues that Doe's reliance on the one-year limitations period

for a due-process Bivens claim "has been *sub silentio* overruled."  Opp. at 35.  As this Court

observed in Liff, this "argument has some appeal."  2016 WL 107914, at *11.  This is because

Owens offers nothing to suggest that the "[f]ederal interests in uniformity, certainty, and the

minimization of unnecessary litigation" attending § 1983 actions are in any way distinct from the

federal interests underpinning Bivens claims.  Both the Supreme Court's and the D.C. Circuit's

near-parallel treatment of § 1983 and Bivens actions, furthermore, suggest that Owens will carry

over into the Bivens context.  See, e.g., Butz v. Economou, 438 U.S. 478, 498-504 (1978) ("[I]n

the absence of congressional direction to the contrary, there is no basis for according to federal

officials a higher degree of immunity from liability when sued for a constitutional infringement

as authorized by Bivens than is accorded state officials when sued for the identical violation

under § 1983."); Doe v. Dist. of Columbia, 697 F.2d 1115, 1123 (D.C. Cir. 1983) (concluding

that "the bodies of law relating to the two forms of litigation [*e.g.*, § 1983 and Bivens] have been

assimilated in most other respects").  This is reinforced by other circuits' decisions to follow

Owens in applying states' residual limitations periods to reputation-based due-process Bivens

claims.  See, e.g., Tapia-Ortiz v. Doe, 171 F.3d 150, 151 (2d Cir. 1999); Kelly v. Serna, 87 F.3d

1235, 1238 (11th Cir. 1996); Van Strum v. Lawn, 940 F.2d 406, 410 (9th Cir. 1991).

All the same, while Owens may have cast a pall over the continued validity of Doe's

statute-of-limitations holding, the D.C. Circuit has nevertheless expressly declined to consider

whether it perforce controls the outcome in an analogous federal Bivens action.  See Earle v.

Dist. of Columbia, 707 F.3d 299, 303 n.3 & 305 (D.C. Cir. 2012) (holding that under Owens a

§ 1983 claim is governed by D.C.'s three-year limitations period, but noting that "[t]he federal

defendants are not before us and so we treat only [the] section 1983 claim").  With no direct

precedent on this point from the D.C. Circuit, and with Plaintiff having failed to factually or

legally distinguish this case from Doe, this Court is bound to follow it under the principles of

stare decisis.  See, e.g., Brewster v. Comm'r of Internal Revenue, 607 F.2d 1369, 1373 (D.C.

Cir. 1979) ("Stare decisis compels adherence to a prior factually indistinguishable decision of a

controlling court."); accord Brooks v. Grundmann, 748 F.3d 1273, 1279 (D.C. Cir. 2014); but

see McDonald v. Salazar, 831 F. Supp. 2d 313, 320 (D.D.C. 2011) (applying District's three-year

limitations period to "reputation plus" due-process claim, but ultimately dismissing claim on

merits), aff'd in part, No. 12-5023, 2012 WL 3068440 (D.C. Cir. July 20, 2012) (summarily

affirming dismissal of due-process claim); Lederman v. United States, 131 F. Supp. 2d 46, 61-62

(D.D.C. 2001) (relying on Owens to determine appropriate statute of limitations for Bivens

claim).  If Doe remains valid, the District's one-year limitations period plainly bars Plaintiff's

claim here, given that Jefferson filed suit nearly three years after July 26, 2011 – the date he

insists the claim accrued.  See Opp. at 35 n.21.

   2.   *Comprehensive Remedial Scheme*

Even if the D.C. Circuit were to overrule Doe, Jefferson's Bivens claim still founders

because Congress's comprehensive statutory and regulatory regime governing disputes arising from the federal employer-employee relationship – *e.g.*, the CSRA and accompanying regulations – implicitly precludes recourse to a <u>Bivens</u> remedy here.

Although the Supreme Court in <u>Bivens</u> indicated that courts have the power to fashion damages remedies for constitutional torts under certain circumstances, <u>see</u> 403 U.S. at 396, in later cases it explained that such a remedy "is not an automatic entitlement no matter what other means there may be to vindicate a protected interest . . . ."  <u>Wilkie v. Robbins</u>, 551 U.S. 537, 550 (2007).  Courts thus "tread carefully before recognizing <u>Bivens</u> causes of action when plaintiffs have invoked them in new contexts."  <u>Meshal</u>, 804 F.3d at 421.

There are two situations in which a damages remedy not previously recognized may be inapt: "The first is when defendants demonstrate special factors counselling hesitation in the absence of affirmative action by Congress[,] [and t]he second is when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective."  <u>Carlson v. Green</u>, 446 U.S. 14, 18-19 (1980) (citation, quotation marks, and emphasis omitted).

Germane here is that the Supreme Court has already concluded in a similar context that the federal employer-employee relationship – governed as it is by a variety of statutes (including the CSRA), regulations, and executive orders – is precisely the type of "special factor[] counselling hesitation" in creating a <u>Bivens</u> remedy.  <u>See</u> <u>Bush v. Lucas</u>, 462 U.S. 367, 372, 385-88 (1983) (declining to craft <u>Bivens</u> remedy for federal employee who alleged retaliatory demotion in violation of First Amendment, where "[f]ederal civil servants are . . . protected by an elaborate, comprehensive scheme," even if "civil service remedies [might not be] as effective as an individual damages remedy").

31

Suggesting that <u>Bush</u> does not control the outcome here, Plaintiff argues that a "special factors" analysis is superfluous because courts in this district have "already recognized <u>Bivens</u> claims for adverse employment actions and for stigma-plus cases."  Opp. at 37.  In other words, this Court would not be doing anything "new" by implying a damages remedy under the Fifth Amendment for a deprivation of the liberty interest in one's reputation.  <u>See id.</u> (citing <u>Campbell v. Dist. of Columbia</u>, 972 F. Supp. 2d 38, 44-45 (D.D.C. 2013), and <u>Salazar</u>, 831 F. Supp. 2d at 320).  But even leaving aside the fact that both are district-court cases – and thus not binding on this Court, <u>see</u> <u>Johnson v. Dist. of Columbia</u>, 850 F. Supp. 2d 74, 79 (D.D.C. 2012) – neither concluded that a <u>Bivens</u> remedy existed for a due-process violation at all.  In fact, <u>Campbell</u> does not even involve a <u>Bivens</u> claim.  <u>See</u> 972 F. Supp. 2d at 44-45 (claim brought under § 1983).  And in <u>Salazar</u>, the Court found that the plaintiff had failed to state a claim for any predicate due-process violation, making it unnecessary to even address the related <u>Bivens</u> issue.  <u>See</u> 831 F. Supp. 2d at 320.

As an alternative, Jefferson argues that even if the CSRA in <u>some</u> circumstances might counsel against a damages remedy, that is not the case here, where the statute gives no protection to <u>him</u>, making <u>Bivens</u> his only route to complete relief.  The government does not dispute that the CSRA's primary remedial provisions were well out of reach for Jefferson; after all, he was a political appointee who could be fired at will.  <u>See</u> Pub L. 99-619, 100 Stat. 3491 (Nov. 6, 1986) (Assistant Secretary of VETS "serve[s] . . . at the pleasure of the President").  As a member of the "excepted service," <u>see</u> 5 U.S.C. § 2103 (defining "excepted service" to consist "of those civil service positions which are not in the competitive service or the Senior Executive Service"), Jefferson had few, if any, means of seeking recourse for wrongs inflicted by his employer.  Most critically, he was barred from accessing the CSRA's "Chapter 75" remedies made available to

many other civil servants, which include the right to appeal an adverse action, and an accompanying "right to notice, representation by counsel, an opportunity to respond, and a written, reasoned decision from the agency." Elgin v. Dep't of Treasury, 132 S. Ct. 2126, 2130 (2012) (citing 5 U.S.C. § 7513); accord Fausto, 484 U.S. at 448 (exclusion of "excepted service" employees from CSRA's remedial provisions reflects "a congressional judgment that those employees should not be able to demand judicial review for the type of personnel action covered by that chapter"). Bereft of other protections, he argues, the CSRA cannot preclude access to a Bivens remedy.

There is one critical defect in this argument, however – "it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies extended thereunder, that counsels judicial abstention." Spagnola v. Mathis, 859 F.2d 223, 227 (D.C. Cir. 1988) (en banc) (citing Schweiker v. Chilicky, 487 U.S. 412, 422-23 (1988)). It is for this reason that the D.C. Circuit in Spagnola rejected the creation of a Bivens remedy for two federal-employee plaintiffs whose constitutional rights were violated but who had no recourse to a significant remedy under the CSRA. See Spagnola, 859 F.2d at 225. Undeniably, Spagnola is not dispositive of the Bivens question here, as the plaintiffs in that case still had access to a remedy – albeit a rather limited one – via a petition with the Merit Systems Protection Board's Office of Special Counsel. See id. & n.3. Jefferson, in contrast, is likely foreclosed from even that limited relief. See 5 U.S.C. § 2302(a)(1)(B) (employees in positions "excepted from the competitive service because of its confidential, policy-determining, policy-making, or policy-advocating character" lack recourse to petition the OSC).

A case of more recent vintage, however – Davis v. Billington, 681 F.3d 377 (D.C. Cir. 2012) – firmly established that a Bivens remedy will not lie even where the CSRA forecloses

"any review for [a plaintiff's] alleged constitutional violations."  Id. at 379, 387 (emphasis

added).  In that case, an excepted-service employee of the Library of Congress claiming

retaliatory demotion in violation of the First Amendment had no route under the CSRA to seek

review of his demotion.  Id. at 384.  The Court reasoned that where "Congress's choice to omit

damages remedies for claimants in [plaintiff's] posture was a deliberate one," no Bivens remedy

should be implied.  Id.  So, too, here; by specifically exempting positions like Jefferson's from

the CSRA, Congress has "spoken" to the issue, and a Bivens remedy should not be created.  See

id. at 387 (noting that a plaintiff's "complete lack of available remedies under the CSRA" does

not "prevent [the statute] from being a 'comprehensive remedial scheme' that precludes . . . a

Bivens remedy.").

        Other circuits have reached the same conclusion.  In Zimbelman v. Savage, 228 F.3d 367

(4th Cir. 2000), the Fourth Circuit concluded that two employees of a federal entity known as a

"non-appropriated fund instrumentality," or NAFI, were barred from pursuing a Bivens remedy

for a reputation-based due-process violation.  Id. at 370-71.  This was so even though the CSRA

specifically states that an "employee paid from nonappropriated funds . . . is deemed not an

employee" under the CSRA (except in a small set of circumstances not relevant here), see 5

U.S.C. § 2105(c), and even though they lacked any recourse under the CSRA.  See Zimbelman,

228 F.3d at 371 ("Congress explicitly addressed the status of NAFI employees when it removed

them from the CSRA's coverage.").  Similarly, the Ninth Circuit in Blankenship v. McDonald,

176 F.3d 1192 (9th Cir. 1999), denied an excepted-service federal court reporter recourse to a

Bivens remedy even though the CSRA provided her with no remedy at all.  See id. at 1194-95;

accord Lee v. Hughes, 145 F.3d 1272, 1274 (11th Cir. 1998) (declining to create Bivens remedy

for excepted-service employee with no "right to file a petition with the Office of Special

Counsel" for adverse personnel action).  Jefferson's <u>Bivens</u> claim will consequently be dismissed.

C.  <u>APA Violation (Count I)</u>

Plaintiff also sues DOL-OIG and four of its officers under the Administrative Procedure Act, which provides "a limited cause of action for parties adversely affected by agency action." <u>Trudeau v. Fed. Trade Comm'n</u>, 456 F.3d 178, 185 (D.C. Cir. 2006).  Although the Complaint does not clearly articulate what he believes DOL-OIG did wrong, Jefferson's Opposition enumerates "five" actions that he views as unlawful.  <u>See</u> Opp. at 8 n.5.  On closer inspection, however, one of those pertains to Count IV because it is asserted against CIGIE, and the remaining four objections comprise only two discrete "actions."  The first "action" he challenges is DOL-OIG's investigation and resulting Report and Cover Memorandum.  He contends this "action" was unlawful because, among other things, the investigation failed to follow unnamed OIG rules and regulations, and the Report and Cover Memorandum were filled with factual and legal errors.  <u>See</u> <u>id.</u>  The second action he challenges is DOL-OIG's "fail[ure] to promulgate" unspecified "rules and regulations governing investigations and reporting pursuant to notice and comment" procedures.  <u>Id.</u>  As Jefferson sees it, due to this critical omission, everything that DOL-OIG did was illegal from the start. <u>See</u> Am. Compl., ¶ 84.

In response, the government argues that neither the investigation nor the resulting Report and Cover Memorandum constitute "final agency action" within the meaning of the APA, and that Jefferson thus lacks a cause of action under that statute.  <u>See</u> Mot. at 6-7.  As to the notice-and-comment violation, Defendants believe that Plaintiff's claim is so vague and ill defined as to warrant summary dismissal.  <u>See</u> Reply at 20-21.

The Court will consider each of Jefferson's two allegations below, concluding that neither suffices to state a claim for relief.  It notes that, as with Count I, even though this count

was brought against individual <u>and</u> agency Defendants, the Court will treat it as brought only against the government, since "[t]he APA does not provide for individual-capacity claims[] or money damages," <u>Duhring Res. Co. v. U.S. Forest Serv.</u>, No. 07-314, 2009 WL 586429, at *6 (W.D. Pa. Mar. 6, 2009), and since "[a]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." <u>Kentucky</u>, 473 U.S. at 166.

1. *Investigation, Final Report, and Cover Memorandum*

As the Court previously explained, the crux of Plaintiff's gripe with the government is that the investigation and ensuing Report were fatally flawed, and that the latter's false and misleading statements ruined his reputation. It is this set of "actions" that he asks this Court to review under the judicial-review provisions of the APA. To survive a motion to dismiss, a plaintiff invoking the APA must meet two requirements relevant here: first, the action must be "agency action" as defined by 5 U.S.C. § 551(13); and second, it must be "final," <u>id.</u> § 704, meaning it "imposes an obligation, denies a right, or fixes some legal relationship." <u>Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n</u>, 324 F.3d 726, 731 (D.C. Cir. 2003). The Court addresses these requirements in reverse order.

a. Finality

To start, there is little question that Jefferson's challenge to the conduct of the <u>investigation</u> itself attacks an action that lacks finality under the APA. <u>See id.</u> ("merely investigatory" actions of a federal commission fall short of "final agency action" where "[n]o legal consequences flow from the agency's conduct"). That is not to say that all non-final actions are always insulated from review, as the APA provides that even "[a] preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704. But the investigation alone cannot

satisfy the APA's threshold requirement of finality.

Whether the Report and Cover Memorandum count as "final agency action" is a slightly more involved question. Because the Inspector General Act makes clear that the OIGs' mandate is to conduct investigations, draft reports, and issue recommendations – suggesting that final action is left to the <u>agency</u> within which each OIG is housed – this Court concludes that mere issuance of the Report and Cover Memorandum is not sufficiently final for purposes of the APA.

"In 1978, Congress, out of concern over governmental inefficiency, created offices of Inspector General in a number of departments and agencies," <u>United States v. Aero Mayflower Transit Co.</u>, 831 F.2d 1142, 1144-45 (D.C. Cir. 1987), including in the Department of Labor. <u>See</u> 5 U.S.C. App. 3 §§ 2(A) & 12(2). The OIG's duties include programs carried out by the agency (or "establishment," which is the generic term used in the IGA), making recommendations, and issuing reports of its findings and conclusions to both the agency and Congress. <u>See</u> <u>id.</u> §§ 4(a) & 5. While the IGA grants the OIGs extensive powers to carry out their investigatory functions, <u>see</u> <u>id.</u> § 6, the statute does <u>not</u> authorize them to take any follow-up action against federal employees on behalf of the agency. <u>See</u> <u>NASA v. Fed. Labor Relations Auth.</u>, 527 U.S. 229, 253 (1999) (Thomas, J., dissenting) ("OIG has no authority over persons employed within the agency outside of its Office and . . . no authority under the Inspector General Act to punish agency employees, to take corrective action with respect to agency programs, or to implement any reforms in agency programs that they might recommend on their own.").

The text of the two documents issued by DOL-OIG attests to the fact that their issuance did not mark the "consummation of the agency's decisionmaking process," nor served as an action "by which rights or obligations [were] determined, or from which legal consequences

w[ould] flow." <u>Bennett v. Spear</u>, 520 U.S. 154, 178 (1997) (citation and quotation marks

omitted). The motivating purpose of the DOL-OIG Report was to determine whether the five

allegations of misconduct made by various complainants had any merit. <u>See</u> DOL-OIG Rep. at

1-2. The Report, then, set out to determine whether the allegation could be substantiated or not.

Each section describes the conversations that the team of investigators had with various

witnesses, Jefferson's "response" to the allegations, and OIG's independent conclusions –

nothing more.

     The succinct, two-page Cover Memorandum – which Jefferson himself describes "as a

kind of executive summary of the Report," Am. Compl. ¶ 24 – drives home the conclusion that

DOL-OIG's work was preliminary in nature. Its language makes clear that the Report serves to

inform DOL of DOL-OIG's investigative findings, leaving to agency management the question

of what to do about it. <u>See</u> Mot., Ex. B (DOL-OIG Memo) at 3 ("[P]lease inform the OIG,

within 30 days, as to any actions which the Department plans to take with respect to the

investigative findings contained in our report."). Quite tellingly, neither the Report nor the

Cover Memorandum provides any concrete suggestions of what corrective actions, if any, it

believes the agency should take, apart from

> recommending that the Department review the three specific
> procurement actions described in the investigative report to
> determine what, if any, further actions should be taken. We are also
> recommending that the Department's Designated Agency Ethics
> Official review the actions of Assistant Secretary Jefferson and
> other senior VETS officials to determine what actions, if any, should
> be taken.

<u>Id.</u> At bottom, DOL-OIG's actions were "more like a tentative recommendation than a final and

binding determination," rendering them non-final under the APA. <u>Franklin v. Massachusetts</u>,

505 U.S. 788, 798-99 (1992) (publication of census report by Department of Commerce is not

final agency action, since decisionmaking process of congressional reapportionment does not conclude until "President takes affirmative steps to calculate and transmit the apportionment to Congress").

Reinforcing the conclusion that these two documents were interlocutory recommendations – and not final agency action – is that, as Plaintiff concedes, "OIG is part of DOL under the IGA." Opp. at 11 (citing NASA, 527 U.S. at 240, 242). Jefferson thus cannot argue that because the Report was OIG's last word on the matter, even if not DOL's, the Report must be final for purposes of the APA.

DOL itself, moreover, appeared to understand that it had more work to do in determining how to proceed with Jefferson. In July 2011, shortly after Plaintiff's superior, Harris, received the Report, he placed Jefferson on administrative leave, "effective immediately and until further notice." Am. Compl., ¶ 53. About a week later, he then presented Jefferson with the choice of resigning or being fired. See id., ¶ 58. While it is plausible that a constructive discharge could serve as a final agency action, see Opp. at 11, Jefferson has not challenged that action under the APA. See Am. Compl., ¶¶ 81-84. And, even if he had, the APA would not be the proper vehicle for pursuing that claim. See Grosdidier v. Chairman, Broad. Bd. of Governors, 560 F.3d 495, 497 (D.C. Cir. 2009) ("Federal employees may not circumvent the [CSRA's] requirements and limitations by resorting to the catchall APA to challenge agency employment actions.").

b.   Agency Action

Although the lack of finality is dispositive of the outcome here, the Court also notes that under prevailing D.C. Circuit precedent, the Complaint fails to plausibly allege that DOL-OIG's publication of documents constitutes "agency action" under the APA. In Hearst Radio, Inc. v. FCC, 167 F.2d 225 (D.C. Cir. 1948), the court considered whether a defamatory agency

publication itself could constitute reviewable "agency action" under the APA.  Noting that the

statute defined "agency action" as "the whole or [a] part of every agency rule, order, license,

sanction, relief, or the equivalent or denial thereof, or failure to act," id. at 227 (quoting Act of

June 11, 1946, Pub. L. 79-404, 60 Stat. 243, § 2(g), now codified as 5 U.S.C. § 551(13)), the

court concluded that "[a]mong these words, the only one approaching applicability to the

publication . . . is the word 'sanction.'"  Id.  But the court concluded that the APA's definition of

that "sanction" "d[id] not cover an act such as" a defamatory publication.  Id. (citing 60 Stat.

243, § 2(f) (defining the word "sanction"), now codified as 5 U.S.C. § 551(10)).  As a result,

Plaintiff could not bring suit under the APA.  Id.

In the ensuing decades, the D.C. Circuit has at least "twice questioned 'the continued

validity of the Hearst Radio decision.'"  Trudeau, 456 F.3d at 189 (quoting Impro Products, Inc.

v. Block, 722 F.2d 845, 849 (D.C. Cir. 1983)); see also Indus. Safety Equip. Ass'n, Inc. v. EPA,

837 F.2d 1115, 1118 (D.C. Cir. 1988).  Despite the court's concern that Hearst Radio's "absolute

immunity rule for agency publications" is misguided, see Indus. Safety Equip. Ass'n, 837 F.2d at

1118, it has "never had the need" to reconsider that holding.  See Trudeau, 456 F.3d at 189.  In

addition, Plaintiff has offered no argument as to why his facts do not fall within the ambit of

Hearst Radio's reasoning.  Even were the Court to conclude that DOL-OIG's actions were

sufficiently final for purposes of the APA, consequently, the allegedly defamatory publications

cannot be considered to be "agency action" under the binding precedent of this circuit.

### 2. *Notice and Comment*

Plaintiff also seeks judicial review of DOL-OIG's reliance on an unidentified set of

"regulations" that Jefferson believes were issued without following the APA's notice-and-

comment procedures.  Jefferson, however, offers no more specificity than that.  He does not

identify any part of a rule, regulation, policy, procedure, or guidance document that he believes was unlawfully put in place.  Because of this complete lack of specificity, the Court is unable to determine whether the APA's notice-and-comment requirements are even applicable, since the statute makes clear that those procedures apply only in specific circumstances.  See Perez v. Mortgage Bankers Assn, 135 S. Ct. 1199, 1204 (2015) ("The notice-and-comment requirement 'does not apply' to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.'") (quoting 5 U.S.C. § 553(b)(A)).  In short, Plaintiff fails to give the government anything even resembling "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  The Court will thus grant Defendants' Motion to Dismiss Count I for failure to state a claim.

D.  Claims Against CIGIE (Count IV)

Plaintiff's last count alleges that the Council of the Inspectors General on Integrity and Efficiency violated his statutory and Fifth Amendment due-process rights by failing to take action on a complaint that Jefferson submitted to it in July 2014.  See Am. Compl., ¶¶ 78-80, 110-124.  To the uninitiated, CIGIE is an "independent entity within the executive branch" that was created by Congress in 2008 to "address integrity, economy, and effectiveness issues that transcend individual Government agencies" and "increase the professionalism and effectiveness" within the "offices of the Inspectors General."  5 U.S.C. App. 3 § 11(a)(2).  To further this mandate, Congress also provided for the establishment of an Integrity Committee within CIGIE to "receive, review, and refer for investigation allegations of wrongdoing that are made against Inspectors General and staff members of the various Offices of Inspector General."  Id. § 11(d).

Although Plaintiff's Complaint levies a barrage of accusations against CIGIE and its Integrity Committee – including that the enacting legislation is constitutionally suspect and that

both CIGIE's and the Integrity Committee's policies and procedures were promulgated in violation of the APA – his Opposition succinctly makes clear that he has one main objection: it declined to take action in response to his 127-page complaint against DOL-OIG.  See Opp. at 41-42 (citing Integrity Committee's October 2014 letter decision dismissing his complaint).  He thus sues CIGIE for violation of his rights under the Inspector General Act, the APA, and the Fifth Amendment's Due Process Clause.

In addressing this count, the Court must first consider whether Plaintiff has standing to pursue his claims.  Because he has not identified an injury that he specifically suffered on account of the Integrity Committee's no-investigation decision, he does not.  Even if Jefferson could satisfy the prerequisites for Article III standing, Count IV would fail for the simple reason that the IGA, the APA, and the Due Process Clause do not present viable causes of action.

1.  *Standing*

Although the question of Plaintiff's standing under Count IV was not briefed by either party, "[i]t is well established that a federal court cannot act in the absence of jurisdiction, . . . and that jurisdictional issues" including Article III standing "may be raised by the court *sua sponte*." Am. Library Ass'n v. FCC, 401 F.3d 489, 492 (D.C. Cir. 2005).  A party's standing "is an essential and unchanging part of the case-or-controversy requirement of Article III."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  To establish standing, a party must, at a constitutional minimum, meet the following criteria.  First, the plaintiff "must have suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical."'"  Id. (citations omitted). Second, "there must be a causal connection between the injury and the conduct complained of – the injury has to be 'fairly . . . trace[able] to the challenged action of the

defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" Id. (alterations in original) (citation omitted).  Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision. '" Id. at 561 (citation omitted).  A "deficiency on any one of the three prongs suffices to defeat standing." U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  Here, Plaintiff cannot establish an injury traceable to the challenged action – *i.e.*, the decision not to investigate – and he thus lacks standing to pursue this claim.

The Supreme Court has clearly indicated that "[a] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973).  The D.C. Circuit, in turn, has extended this principle to encompass a private citizen's interest in the investigation of another – here, DOL-OIG.  See, e.g., In re Kaminski, 960 F.2d 1062, 1065 (D.C. Cir. 1992) (no standing to compel government investigation of judicial misconduct under Ethics in Government Act).  The only conceivable exception might be the existence of a statutorily enacted private right of action, but because Congress explicitly stated that no such action would lie, Plaintiff cannot establish standing on that basis.  Cf. Petition for Writ of Certiorari, Spokeo, Inc. v. Robins, 2014 WL 1802228, No. No. 13-1339 (presenting question: "Whether Congress may confer Article III standing upon a plaintiff who suffers no concrete harm, and who therefore could not otherwise invoke the jurisdiction of a federal court, by authorizing a private right of action based on a bare violation of a federal statute."); 135 S.Ct. 1892 (2015) (granting writ of certiorari).

2. *Failure to State a Claim*

In the same subsection of the Inspector General Act that established the Integrity Committee, Congress included an express provision that the statute confers neither substantive

43

nor procedural rights on any individual.  <u>See</u> 5 U.S.C. App. 3 § 11(d)(11) ("No right or benefit. This subsection is not intended to create any right or benefit, substantive or procedural, enforceable at law by a person against the United States, its agencies, its officers, or any person.").  Plaintiff has not addressed why the broad and all-encompassing language of this provision does not operate to bar his claim here.

In addition, the statutory standards governing when and how the Integrity Committee should investigate a particular matter do not lend themselves to judicial resolution, particularly with regard to the Committee's decision not to investigate a particular matter.  <u>See</u> 5 U.S.C. App. 3 §§ 11(d)(4)-(8); <u>cf.</u> Reply, Attach. 1 (<u>Heide v. Scovel</u>, No. 08-727, slip op. at 13 (D. Minn. Oct. 1, 2008) ("[IGA's] standards for conducting investigations . . . are not meaningful standards that the courts can review and do not provide even minimal guidance to limit agency discretion.")).  As a result, Jefferson cannot circumvent the IGA's clear language by bringing a parallel claim under the APA.  <u>See</u> 5 U.S.C. § 701(a)(2) (exempting from judicial review agency action that is "committed to agency discretion by law"); <u>see also</u> <u>Heide</u>, slip op. at 12-14 (holding that plaintiff cannot compel investigation by OIG of Department of Transportation given lack of clear standards guiding OIG's discretion whether to investigate).

The Due Process Clause similarly offers no basis to sue CIGIE, as Plaintiff has not alleged a protectable interest in liberty or property that was deprived by CIGIE's failure to take further action on his complaint.  <u>Cf.</u> <u>Futch v. Fine</u>, No. 09-420, 2009 WL 565616, at *1 (D.D.C. Mar. 5, 2009) ("There is . . . no such thing as a due process right to an investigation by the . . . Inspector General . . . .").  That decision has no bearing on whether he was deprived of a liberty interest in his reputation by DOL and DOL-OIG.  Apart from <u>that</u> interest, Jefferson has not presented any other constitutionally protected interest that was affected by the Integrity

44

Committee's decision to dismiss his complaint.  Count IV will thus be dismissed in its entirety.

## IV.     Conclusion

Although Plaintiff tries mightily to extract a pound of flesh for this salvo of slights, his remedies will be far more limited.  The Due Process Clause may ultimately help him to mend some of his wounds, but it is not a cure-all for any and all harm inflicted at the hands of the government.  The Court will, consequently, grant in part and deny in part Defendants' Motion to Dismiss.  A separate Order consistent with this Opinion will be issued this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  March 21, 2016