# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RAYMOND M. JEFFERSON,

      Plaintiff,

      v.

SETH D. HARRIS, *et al.*,

      Defendants.

Civil Action No. 14-1247 (JEB)

## MEMORANDUM OPINION

Nearly one year after this Court dismissed the majority of the counts in his First Amended Complaint, Plaintiff Raymond Jefferson is back for another round. In his Motion for Leave to File a Second Amended Complaint, Jefferson renews his effort to clear his name of the accusations leveled against him in a 2011 investigation and report by the Department of Labor's Office of Inspector General. Defendants – the U.S. Department of Labor, the Department's Office of Inspector General, the Council of the Inspector General on Integrity and Efficiency, and five individuals – oppose this third bite at the apple. After toiling through Jefferson's prolix pleading, the Court ultimately concludes that one additional claim may proceed.

Counts II and III, Plaintiff's Administrative Procedure Act and <u>Bivens</u> claims, were already dismissed in this Court's prior Opinion and are re-pled here largely to preserve them for appeal. Count IV, Jefferson's new cause of action under the Appointments Clause, cannot survive, both because he lacks standing and because it is facially deficient. It is only Count I, which alleges procedural and substantive due-process violations, that the Court concludes states a plausible basis for relief. The lack of prejudice to Defendants and the liberal standard for

amending complaints counsel in favor of allowing Jefferson to move forward with this augmented count. The Court will therefore grant leave to amend in this limited respect.

## I.    Background

The lengthy factual history of this case is set forth in full in this Court's prior Opinion and need not be repeated here. See Jefferson v. Harris, 170 F. Supp. 3d 194 (D.D.C. 2016). Suffice it to say that Jefferson, a former high-level appointee in the Department of Labor, believes himself the victim of an Inspector General's defamatory campaign relating to his procurement efforts. Appointed in 2009 to serve as the Assistant Secretary of Labor for Veterans' Employment and Training Services (VETS), Jefferson's central grievance revolves around a 2011 investigation and resulting Report by DOL's Office of Inspector General (DOL-OIG). Id. at 198. This Report and an accompanying Cover Memorandum described an alleged "pattern of conduct" by Jefferson that "reflect[ed] a consistent disregard of federal procurement rules and regulations, federal ethics principles, and the proper stewardship of appropriated dollars." ECF No. 19, Exh. B (Cover Memorandum) at 1.

In his First Amended Complaint, Plaintiff alleged that these criticisms were false, and that the investigation and Report were motivated by personal animus and riddled with factual and legal errors. See ECF No. 16 (First Amended Complaint), ¶¶ 29-50. According to Jefferson, the day after the Report was issued to his boss, Deputy Secretary Seth Harris, he was placed on administrative leave. Four days later, Harris informed him that he had "four hours in which to resign or be fired," id., ¶ 58, and Jefferson submitted his resignation to the Secretary of Labor that afternoon. Id., ¶ 61. Yet Plaintiff's alleged mistreatment did not end with his departure. Instead, the next day DOL and DOL-OIG held a joint press conference at which they publicly discussed the Report and Memorandum and thereby repeated the "false charges, errors of fact,

and mistakes of law." Id., ¶ 62. The accusations against Jefferson were subsequently reported in The Washington Post and other publications, and were the subject of a press conference held by Senator Claire McCaskill, then-Chair of the Homeland Security Subcommittee on Contracting Oversight. Id., ¶¶ 63-65.

Following his resignation, Jefferson embarked upon what is now a six-year journey to find redemption. In 2014, he filed a complaint with the Council of the Inspectors General on Integrity and Efficiency (CIGIE) against DOL-OIG and the relevant investigators, alleging violations of "OIG regulations, the [Inspector General Act], the APA, and [his] due process rights." Id., ¶ 78. Three months later, CIGIE's Integrity Committee informed Plaintiff that it would not be taking action on the matter. Id., ¶ 80.

The same month that Jefferson filed his CIGIE complaint, he also filed suit in this Court. See ECF No. 1 (Complaint). After amending his Complaint in March 2015, Plaintiff set forth four discrete counts against Defendants. See Jefferson, 170 F. Supp. 3d at 202   Count I accused DOL-OIG and the individual officers involved in the investigation of violating the APA. Id. Count II asserted that DOL, DOL-OIG, Harris, and four individuals involved in the investigation – Daniel Petrole, Asa Cunningham, David Russ, and James Powell – violated Plaintiff's due-process rights by injuring his reputation. Id. Count III sought damages against all individual Defendants under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), and Count IV consisted of claims against CIGIE under the Inspector General Act, the APA, and the Due Process Clause. Id. at 203. Defendants moved to dismiss Jefferson's Complaint in its entirety, see ECF No. 19 (Motion to Dismiss), and on March 21, 2016, this Court issued a Memorandum Opinion and Order granting that request as to the majority of Plaintiff's counts. See Jefferson, 170 F. Supp. 3d at 222. Specifically, the Court dismissed

Counts I, III, and IV, and allowed only Count II, which alleged a procedural due-process violation, to proceed.  Id.

After receiving a series of extensions, Jefferson now moves for leave to file a 94-page Second Amended Complaint alleging four counts (ordered in a different fashion from the First Amended Complaint).  The first count has two subparts, offering both procedural and substantive due-process claims.  The second reiterates the earlier Bivens claims, and the third again invokes the APA.  The last sets out a new claim under the Appointments Clause.  See ECF No. 44-1 (Second Amended Complaint).  As Defendants have opposed Plaintiff's Motion, see ECF No. 52, the Court must now determine whether to grant him the requested leave to amend and, if so, on which counts.

## II.    Legal Standard

A plaintiff may amend his complaint once as a matter of course within 21 days of serving it or within 21 days of the filing of a responsive pleading.  See Fed. R. Civ. P. 15(a)(1). Otherwise, he must seek consent from the defendant or leave from the court.  The latter "should [be] freely give[n] . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).  In deciding whether to grant leave to file an amended complaint, courts may consider "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  Foman v. Davis, 371 U.S. 178, 182 (1962).  In this Circuit, "it is an abuse of discretion to deny leave to amend unless there is sufficient reason." Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  Furthermore, under Rule 15, "the non-movant generally carries the burden in persuading the court to deny leave to amend." Nwachukwu v. Karl, 222 F.R.D. 208, 211 (D.D.C. 2004).

It is clear, however, that amendment should not be permitted if it would be futile. In other words, if the new causes of action would still be deficient notwithstanding the proposed amendment, courts need not grant leave. See In re Interbank Funding Corp. Securities Litigation, 629 F.3d 213, 218 (D.C. Cir. 2010) ("[A] district court may properly deny a motion to amend if the amended pleading would not survive a motion to dismiss.") (citing Foman, 371 U.S. at 182, for proposition that "'futility of amendment' is permissible justification for denying Rule 15(a) motion"); James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir. 1996) ("Courts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss.") (citations omitted).

### III.    Analysis

In conducting its analysis, the Court first briefly considers the reasserted APA and Bivens counts, which are re-pled essentially for appellate purposes. It next looks at both the procedural and substantive due-process claims, before concluding with the new Appointments Clause count.

### A.    APA and Bivens (Counts II & III)

The Court begins by clearing away Jefferson's APA and Bivens claims, both of which were dismissed in the prior Opinion. Plaintiff maintains that he "re-pleads claims that this Court has already dismissed in order to preserve them for appeal." ECF No. 41 (Motion for Leave to File) at 2-3. Yet, as Defendants point out, see Opp. at 8-9 and Jefferson acknowledges in his Reply, "he need not have re-alleged . . . his dismissed claims in order to preserve them for appeal under D.C. Circuit precedent." Reply at 9 n.6. The Court agrees and therefore will not grant leave to amend with respect to the previously dismissed counts. See BEG Investments, LLC v. Alberti, 85 F. Supp. 3d 13, 50 (D.D.C. 2015) (noting the "absence of any authority to support

Plaintiff's belief that reassertion of its dismissed claims was necessary" to preserve such claims for appellate review).

To the extent that Jefferson reiterates his Bivens and APA claims in order to add "more detailed factual allegations" and "greater context," Mot. at 3, the Court notes that these claims were dismissed on legal, not factual, bases. Such efforts therefore do not provide grounds for leave to amend. Robinson v. Detroit News, Inc., 211 F. Supp. 2d 101, 114 (D.D.C. 2002) (amendment futile if it "reasserts a claim on which the court previously ruled"). With respect to the Bivens count, the Court held that it was untimely, as Jefferson was limited by the one-year statute of limitations for defamation under D.C. law. See Jefferson, 170 F. Supp. 3d at 213-14. The Court additionally concluded that, regardless of timeliness, a Bivens remedy would not be cognizable because, by "specifically exempting positions like Jefferson's from the [Civil Service Reform Act]," Congress had deliberately chosen to omit damages remedies for claimants in Plaintiff's position. Id. at 216. As to the APA counts, the Court found that the Report and Cover Memorandum were "interlocutory recommendations – and not final agency action," and therefore could not be challenged under the APA. Id. at 218. It held, moreover, that even without such a lack of finality, Jefferson would nonetheless not prevail because DOL-OIG's publication of the two documents did not constitute "agency action under the binding precedent of this circuit." Id. at 219 (citing Hearst Radio, Inc. v. FCC, 167 F.2d 225 (D.C. Cir. 1948)).

The Court similarly rejects Plaintiff's argument that by "identifying specific regulations at issue and final agency action," the Second Amended Complaint "sets forth Administrative Procedure Act claims that are consistent with" the prior Opinion. See Mot. at 2. As with the other APA allegations in the previous Complaint, the Court denied Plaintiff's notice-and-comment claim not solely because it was supported by insufficient facts, but also because the

Act's notice-and-comment requirements "do[] not apply to interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." Jefferson, 170 F. Supp. 3d at 220 (internal quotation marks and citation omitted). The only "specific regulations" identified in Plaintiff's Second Amended Complaint fall well within the ambit of such internal agency practices, see SAC, ¶ 226, and his renewed claim is thus precluded by the Court's prior legal conclusion. Contrary to Jefferson's assertion that the Court "invit[ed]" him to expand upon his APA claims, the prior Opinion left no such door ajar.

Plaintiff's attempt to distinguish his previously asserted Bivens count from those alleged in the Second Amended Complaint meets a similar fate. Although he acknowledges that the Court dismissed his Bivens claims regarding actions taken while he was employed at DOL, Jefferson contends that the Second Amended Complaint includes a new Bivens theory – namely, an action against Harris for a memorandum he issued after Jefferson left DOL, which Plaintiff contends "repeated and ratified a number of the" agency's "false legal and factual conclusions." Mot. at 2; see SAC, ¶¶ 149, 196-206. Yet this distinction makes no difference when it comes to the scope of the Court's prior legal conclusions. As it already determined, the existence of a comprehensive remedial scheme under the CSRA counsels against the creation of a Bivens remedy for those claims arising out of Plaintiff's employment at VETS. See Jefferson, 170 F. Supp. at 212. This rationale applies even if the alleged unconstitutional defamation occurred after Plaintiff's resignation, as Harris's memorandum was nonetheless part of the broader removal proceedings. As Jefferson himself states, the memorandum was "DOL's response to the Report," and he asserts that its publication was a "final agency action" regarding the investigation. See SAC, ¶ 148. Harris's alleged defamation subsequent to Plaintiff's resignation is entwined with Jefferson's employment at DOL, and any Bivens action thus remains precluded

by the CSRA's remedial scheme.  See Peter B. v. CIA, 620 F. Supp. 2d 58, 72 (D.D.C. 2009) (holding that defamation occurring after status change in employment is deemed to accompany the change when offered as official reason for action).

B.  Due Process (Count I)

Although inexplicably grouped in a single count, Jefferson articulates both a substantive and a procedural due-process challenge.  The Court thus examines them separately.

1.  *Procedural*

The sole count left intact in the Court's prior Opinion was Jefferson's procedural due-process claim.  He now seeks to expand its scope.  As discussed in the prior Opinion, a plaintiff may avail himself of two legal theories to establish a reputation-based due-process violation – "reputation plus" and "stigma plus."  Jefferson, 170 F. Supp. 3d at 205.  The former requires the "conjunction of official defamation and [an] adverse employment action."  O'Donnell v. Barry, 148 F.3d 1126, 1140 (D.C. Cir. 1998).  To plead such a claim, a plaintiff must show "that the government's defamation resulted in a harm to some interest beyond reputation," such as a "loss of present . . . government employment," that the "government has actually stigmatized his . . . reputation," and that "the stigma has hampered future employment prospects."  Jefferson, 170 F. Supp. 3d at 205 (emphasis added) (citation omitted).  Finding that Jefferson had "adequately pled" these elements, the Court denied Defendants' Motion to Dismiss with respect to the reputation-plus due-process claim.  Id.

The Court concluded, conversely, that Plaintiff could not proceed with his stigma-plus theory.  Id. at 206.  Unlike a reputation-plus claim, the stigma-plus theory "does not depend on official speech, but on a continuing stigma or disability arising from official action."  O'Donnell, 148 F.3d at 1140 (emphases added).  To allege a violation under this approach, moreover, a

plaintiff must show that the official action not only "hampered" his future employment, but in fact "had the 'broad effect of largely precluding [him] from pursuing [his] chosen career.'" Jefferson, 170 F. Supp. 3d at 205 (quoting Kartseva v. Dep't of State, 37 F.3d 1524, 1528 (D.C. Cir. 1994)). Finding that Jefferson had not demonstrated that "his ability to pursue his chosen profession has been 'seriously affected, if not destroyed,'" the Court concluded that he did not make out a stigma-plus claim. Id. (citing O'Donnell, 148 F.3d at 1141-42) (quoting Kartseva, 37 F.3d at 1529).

Now, in his proposed Second Amended Complaint, Jefferson offers a series of new allegations intended to show that he has, in fact, been broadly precluded from working in his chosen field. See SAC, ¶¶ 156-165. Unlike the First Amended Complaint, in which Plaintiff alleged merely that he has "found it very difficult to obtain a job," FAC, ¶ 72, the Second Amended Complaint adds a significant amount of detail with respect to his alleged inability to obtain a position in his "chosen profession." He claims that "public service was [his] vocation and his profession of choice," SAC, ¶ 158, and that the "legally and factually false allegations contained in the Report and Memorandum have precluded [him] from pursuing his vocation." Id., ¶ 160. In support of his assertion that Defendants' acts "cemented the end of [his] public service career," Jefferson alleges that a "very high level official at the White House" informed his representative that "no future Administration would hire Jefferson" and that he was "radioactive in the Democratic Party." Id., ¶¶ 160-61. In sum, Jefferson contends that Defendants' acts "precluded him from pursuing his vocation in the public sector in any position." Id., ¶ 188.

Defendants rejoin that Jefferson's amended stigma-plus claim is futile because he "does not plausibly show that he can no longer practice" his profession. See Opp. at 14. They contend

that it is improper for Plaintiff "to define his 'profession' so narrowly, for a person with plaintiff's pedigree can surely do many jobs, and in fact he is doing so." Id. This assertion, however, ignores the fact that a plaintiff must show only that the government's imposition of a stigma has "seriously affected" his "right to . . . follow a chosen profession," Greene v. McElroy, 360 U.S. 474, 492 (1959) (emphasis added), or "chosen line of business." Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Fed. Deposit Ins. Corp., 132 F. Supp. 3d 98, 123 (D.D.C. 2015) (emphasis added). It may well be that the alleged harm to Jefferson's reputation has had no impact on his ability to pursue a range of professional opportunities, and that the government is correct that he can "surely do many jobs." Yet the question with respect to a stigma-plus claim is not whether the plaintiff is entirely unemployable. The liberty interest implicated under this theory is, instead, his "constitutionally protected right" to work in his field of choice. See Crooks v. Mabus, 845 F.3d 412, 421 (D.C. Cir. 2016).

Here, Jefferson's proposed amendment sets forth sufficient facts to state a plausible stigma-plus claim. Although "[d]ischarge from a particular job is not the same as exclusion from one's chosen profession," government action resulting in "broad preclusion from [a plaintiff's] chosen field" is sufficient to implicate a Fifth Amendment liberty interest. Id. at 421 (quoting Abdelfattah v. U.S. Dep't of Homeland Sec., 787 F.3d 524, 539 (D.C. Cir. 2015)) (quotation marks omitted). Taking as true the alleged impact of Defendants' investigation and Report on Plaintiff's career and employment prospects, it is plausible that his preclusion from his chosen profession of public service is "sufficiently broad" so as to infringe upon his protected liberty interest. See Taylor v. Resolution Tr. Corp., 56 F.3d 1497, 1506 (D.C. Cir.), opinion amended on reh'g, 66 F.3d 1226 (D.C. Cir. 1995); cf. Cafeteria and Restaurant Workers v. McElroy, 367 U.S. 886, 895–96 (1961) (revocation of short-order cook's permission to work on military base

did not implicate liberty interest in part because she "remained entirely free to obtain employment <u>as a short-order cook</u>") (emphasis added).

The Court notes, moreover, that Defendants do not assert that they would suffer any prejudice if Plaintiff were permitted, at this pre-discovery stage of litigation, to amend his due-process claim. And given that Jefferson's reputation-plus claim has already been allowed to proceed, the Court concludes that no undue burden would result from allowing him to additionally allege a stigma-plus theory. In light of the liberal standard under Rule 15, the Court will grant leave to amend with respect to Jefferson's stigma-plus due-process claim.

### 2. *Substantive*

In addition to supplementing his procedural due-process count, Jefferson's Second Amended Complaint also sets forth a substantive due-process allegation. The prior Opinion concluded, "[A]lthough Plaintiff in his Opposition insists that Count II alleges both substantive <u>and</u> procedural due-process violations, the [First] Amended Complaint contains not a single suggestion that Jefferson intended to advance the former." <u>Jefferson</u>, 170 F. Supp. 3d at 204. The Court, consequently, did not address the merits of any such claim.

Jefferson now brings an explicit substantive due-process allegation. <u>See</u> SAC, ¶¶ 189-195. He asserts that Defendants "acted arbitrarily and oppressively by knowingly violating at least a dozen regulations governing OIG and conducting a biased and incomplete investigation." <u>Id.</u>, ¶ 191. Such acts, he alleges, were a reflection of Defendants' "callous indifference to the suffering they inflicted" and were taken "knowing that [they] would destroy Jefferson's professional and personal reputation." <u>Id.</u>, ¶ 192. He contends that such acts were "unjustifiable by any government interest" and therefore violated his rights under the Due Process Clause. <u>See</u> Reply at 10.

As Defendants convincingly retort, such allegations do not plausibly state a traditional due-process violation. See Opp. at 22-24. Substantive due process protects against "government power arbitrarily and oppressively exercised," but "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). In order to make out a substantive due-process violation, a plaintiff must therefore establish that defendants' conduct "shock[s] the contemporary conscience." Harvery v. District of Columbia, 798 F.3d 1042, 1049 (D.C. Cir. 2015). Given this narrow application of the doctrine, courts are generally "reluctant to expand the concept of substantive due process," as there are few clear "guideposts for responsible decisionmaking." Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992). This Court is similarly unwilling to conclude that Plaintiff's alleged mistreatment by Defendants is so egregious so as to shock the modern conscience. Even taking the facts as set forth in Jefferson's Second Amended Complaint as true, the conduct he alleges does not rise to the level of "malicious and sadistic" abuses of power by government officials. See Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 252 (2d Cir. 2001).

Yet Jefferson is not entirely out of luck. In addition to asserting that Defendants' conduct was arbitrary and oppressive, Plaintiff contends that they violated his due-process rights by failing to follow the relevant agency regulations governing internal investigations. See Reply at 11-12. The legal basis for this argument is the Accardi doctrine, which holds that "government agencies are bound to follow their own rules, even self-imposed procedural rules that limit otherwise discretionary decisions." Wilkinson v. Legal Servs. Corp., 27 F. Supp. 2d 32, 34 n.3 (D.D.C. 1998) (citing United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 267-68 (1954)). Failure to do so arguably gives rise to a due-process claim. See Wilkinson, 27 F. Supp. 2d at 58. Here, Jefferson alleges that OIG's investigation, the Report and Memorandum, and the

letter from the IC violated numerous OIG policies and IG regulations and guidelines.  See SAC,

¶¶ 80-84, 89-92, 94-96, 123-29, 168-70.  Among other failings, Plaintiff asserts that OIG

violated its internal manual by giving him the incorrect form (which did not include a notice of

his relevant rights) when he signed affidavits, and that the Office improperly failed to inform him

that he was the target of the investigation or of the charges against him.  Id., ¶¶ 89-92, 94-96,

122-25.

Taken as true, and assuming without deciding at this point in the proceedings that the

relevant regulations and guidelines could be the basis for an Accardi claim, these allegations

appear to state a plausible basis for relief.  As required under the doctrine, Jefferson is

additionally able to demonstrate prejudice as a result of Defendants' alleged deviations from

internal policies.  See Vanover v. Hantman, 77 F. Supp. 2d 91, 106 (D.D.C. 1999), aff'd, 38 F.

App'x 4 (D.C. Cir. 2002) (noting that courts will not, under the Accardi doctrine, "void the result

of the [agency] proceeding if the error was harmless").  Plaintiff contends that "[w]ithout

fundamental notice regarding the allegations against [him], [he] . . . could not apprehend what

information was relevant, what information to provide to investigators, what allegations to rebut,

or any other elements of a proper defense."  SAC, ¶ 91.  He alleges, moreover, that by giving

him the incorrect form and failing to inform him of the scope of the investigation, Defendants

prevented him from "appreciat[ing] the advisability of retaining legal counsel to advise [him] as

to the nature of the charges and to help [him] craft an effective response and defense."  Id.  Such

interference with regulations that seek to safeguard a plaintiff's individual rights implicates the

Accardi doctrine and its requirement that agencies abide by their own procedures.  See Morton v.

Ruiz, 415 U.S. 199, 235 (1974) (holding that "[w]here the rights of individuals are affected, it is

incumbent upon agencies to follow their own procedures.  This is so even where the internal

procedures are possibly more rigorous than otherwise would be required."); Abdi v. Duke, No. 17-721, 2017 WL 5599521, at *9 (W.D.N.Y. Nov. 17, 2017) (noting that violation of "internal policy" implicates Accardi doctrine if it "pertains to individual rights").

The Court notes, however, that the caselaw is far from clear as to whether an Accardi claim is properly raised as a substantive due-process allegation. Although certain cases suggest that the doctrine has roots in the Due Process Clause, others have held that Accardi claims are better understood as arising under the APA or as stand-alone causes of action. Compare Wilkinson, 27 F. Supp. 2d at 58 (concluding that a "substantive due process explanation" is best foundation for the doctrine), and Montilla v. INS, 926 F.2d 162, 167 (2d Cir. 1991) ("Accardi doctrine is premised on fundamental notions of fair play underlying the concept of due process"), with Tapp v. Washington Metro. Area Transit Auth., 2016 WL 7441719, at *6 n.8 (D.D.C. Sept. 30, 2016) (stating that Accardi claim is "distinct cause of action that differs from a claim brought under the Fifth Amendment's Due Process Clause"), and Vanover v. Hantman, 77 F. Supp. 2d 91, 109 (D.D.C. 1999), aff'd, 38 F. App'x 4 (D.C. Cir. 2002) (noting that plaintiff's claim of due-process violation from failure to follow internal regulations could be "considered as either a constitutional" or as separate "Accardi claim").

The Court fortunately need not delve into the murky waters of the doctrine and its origins. See Wilkinson, 27 F. Supp. 2d at 47–48 (noting that "identifying the legal source for the Supreme Court's pronouncement that government agencies are bound to follow their own rules is no simple matter"). Regardless of whether Jefferson's Accardi claim fits squarely under his due-process heading, the Court concludes that it is adequately pled at this stage in the proceedings, and Defendants have alleged no prejudice in allowing the addition of this count. Mindful of Rule 15's liberal standards, the Court will therefore grant leave to amend with respect

to the substantive due-process claim. Defendants, who have not had an opportunity to respond to Plaintiff's Accardi arguments, are of course free to contest their viability in future proceedings.

    C.  Appointments Clause (Count IV)

    The Court last turns to Count IV of the Second Amended Complaint – Jefferson's new Appointments Clause allegation. See SAC, ¶¶ 229-233. This claim is based on the alleged injury Plaintiff suffered when the Integrity Commission – an entity within CIGIE composed of four IGs, the FBI official serving on the Council, the Special Counsel of the Office of Special Counsel, and the Director of the Office of Government Ethics, see 5 U.S.C. App. 3 § 11(d)(2)(A) – declined to pursue further review of his 2014 Complaint against DOL employees Petrole, Cunningham, Russ, and Powell. This Complaint asserted that the four individuals had "willfully and wantonly violat[ed] OIG regulations, the IGA, the APA, and Jefferson's due process rights by failing to conduct a full and fair investigation, by knowingly issuing a legally and factually false Memorandum and Report, and by failing to notify Jefferson . . . of the allegations against [him] and depriving [him] of a meaningful opportunity to be heard." SAC, ¶ 166. Three months after filing the CIGIE Complaint, the Integrity Commission (IC) of CIGIE sent Plaintiff a letter stating that "the IC determined the allegation does not meet the threshold standard necessary for further review since the allegation did not concern the actions of a currently covered OIG official who is subject to the IC's jurisdiction." Id., ¶ 168. The letter went on to inform Jefferson that the IC had therefore "closed the complaint and will take no further action on the matter." Id.

    According to Jefferson, this determination was fundamentally flawed. He alleges that the decision to close his Complaint was in fact unconstitutional, as he asserts that the IGA provisions governing the composition of the IC violate the Appointments Clause. Id., ¶¶ 231-232; see U.S. Const., art. II, § 2, cl. 2. Arguing that the members of the IC are "officers" within the meaning

of the Clause, Plaintiff contends that their method of appointment does not fulfill the constitutional requirements for such positions.  Id.  Although this claim is certainly creative, the Court concludes that it is also futile.  As discussed below, Plaintiff does not have standing to bring his Appointments Clause count, and, even if he did, he would not prevail on the merits.

### 1. *Standing*

The Court considers first the threshold issue of whether Jefferson even has standing to advance such a count.  He alleges that he was "injured by [the] constitutionally invalid IC holding . . . that it lacked jurisdiction to consider his meritorious CIGIE Complaint," and "by jurisdictional rules issued in whole or in part by the IC that purportedly deprived it of jurisdiction in contravention of the IGA."  SAC, ¶ 233.  Plaintiff further alleges that the IC ruling forced him to "pursue an expensive federal lawsuit in order to seek review of [Petrole, Cunningham, Russ, and Powell's] abuses . . . instead of CIGIE and the IC."  Id., ¶ 172.  Are these alleged injuries sufficient for standing?

Defendants argue in the negative, citing the same reasons that the Court relied on in finding he lacked standing to bring other allegations regarding the IC determination.  See Opp. at 29.  The Court did previously dismiss Jefferson's APA and due-process claims against CIGIE because, as a private citizen, he lacked "a judicially cognizable interest in the prosecution or nonprosecution of another" and could not seek to "compel [a] government investigation of another."  Jefferson, 170 F. Supp. 3d at 221.  Because he could not "establish an injury traceable to the challenged action – *i.e.*, the [IC's] decision not to investigate" – the Court concluded that he lacked standing to pursue his CIGIE claims.  Id. at 221.  According to Defendants, this conclusion applies with equal force to Jefferson's new count against the IC under the Appointments Clause.  They assert that even under the relatively broad standing approach for

such challenges, Plaintiff still cannot establish a cognizable injury arising from the IC's inaction. See Opp. at 30-31.

The Court agrees. Although this Circuit has held that Appointments Clause claims "will proceed even where any possible injury is radically attenuated," Jefferson's alleged injury is nonetheless insufficient to confer standing in this case. See Landry v. FDIC, 204 F.3d 1125, 1131 (D.C. Cir. 2000). The prior decisions addressing standing in Appointments Clause cases all featured plaintiffs who had, in fact, been subject to an action by the official whose appointment they challenged as constitutionally invalid. See id. at 1128-30 (plaintiff challenged FDIC process for appointing ALJs after having been removed from position as bank officer based on ALJ decision); Freytag v. CIR, 501 U.S. 868, 871-72 (1991) (plaintiffs challenged process for appointing Special Trial Judge who assessed federal income-tax deficiencies against them); Tucker v. Comm'r, 676 F.3d 1129 (D.C. Cir. 2012) (taxpayer challenged process for appointing IRS Office of Appeals employees after those employees heard plaintiff's challenge to tax-deficiency determination).

Here, by contrast, the Court has already concluded that Jefferson's alleged harm – a governmental decision not to investigate others – involves no "judicially cognizable interest." 170 F. Supp. 3d at 221; cf. Futch v. Fine, 2009 WL 565616, at *1 (D.D.C. Mar. 5, 2009) ("There is . . . no such thing as a due process right to an investigation by the . . . Inspector General."). Challenges under the Appointments Clause may require a lesser degree of causation between the alleged harm and the constitutional violation, but it does not follow that any asserted injury is cognizable in such contexts. Because Jefferson cannot allege a legally protected interest in the IC's non-investigation, he is unable to establish standing even under the permissive standards of

the Appointments Clause. The Court therefore concludes that it would be futile to permit amendment on this count.

### 2. *Merits*

Although the Court finds that Jefferson lacks standing, it will, out of an abundance of caution, briefly address the merits of this count. The Appointments Clause states:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. The Constitution thus "limits congressional discretion to vest power to appoint 'inferior Officers' to three sources" – the President, the heads of governmental departments, and the courts. See Freytag, 501 U.S. at 878. According to Plaintiff, the composition of the IC runs afoul of this provision.

Specifically, Jefferson asserts that the four members of the IC who are appointed by the CIGIE Chairperson, see 5 U.S.C. App. 3 § 11(d)(2)(A)(ii), are inferior officers within the meaning of the Appointments Clause; the Chairperson thus has no authority to appoint them. See Reply at 23-25. In response, Defendants assert that the IC members are not inferior officers, but are instead "lesser functionaries" (also called "employees") within the government, who "need not be selected in compliance" with the Appointments Clause. See Opp. at 31 (citing Freytag, 501 U.S. at 880).

Unfortunately, as the Court of Appeals has conceded, "[t]he line between 'mere' employees and inferior officers is anything but bright.'" Landry, 204 F.3d at 1132. The Supreme Court has applied a wide range of definitions to the "inferior officer" role, *inter alia*,

(1) those charged with "the administration and enforcement of the public law," <u>Buckley v. Valeo</u>, 424 U.S. 1, 139 (1976); (2) those granted "significant authority," <u>id.</u> at 126; (3) those with "responsibility for conducting civil litigation in the courts of the United States," <u>id.</u> at 140; and (4) those "who can be said to hold an office," <u>United States v. Germaine</u>, 99 U.S. 508, 510 (1879), that has been created either by "regulations" or by "statute." <u>United States v. Mouat</u>, 124 U.S. 303, 307-08 (1888); <u>see also</u> <u>Free Enter. Fund v. PCAOB</u>, 561 U.S. 477, 539 (2010) (Breyer, J., dissenting) (collecting "inferior officer" definitions).

This Circuit has in turn attempted to provide guidance when it comes to distinguishing "lesser functionaries" from such officers. "The main criteria for drawing the line between inferior Officers and employees not covered by the clause are (1) the <u>significance</u> of the matters resolved by the officials, (2) the <u>discretion</u> they exercise in reaching their decisions, and (3) the <u>finality</u> of those decisions." <u>Tucker</u>, 676 F.3d at 1133. The Circuit has stated, moreover, that the third prong – finality – can be dispositive when drawing the line between officers and subconstitutional employees. <u>Id.</u> at 1143 (noting that <u>Landry</u> held that "the absence of any authority to render final decisions [was] fatal to the claim that the [persons] at issue were Officers rather than employees"). And, although other circuits disagree with <u>Landry</u>'s emphasis on finality, <u>see, e.g.</u>, <u>Bandimere v. SEC</u>, 844 F.3d 1168, 1183 (10th Cir. 2016) (holding that "final decision-making authority" is not "the crux of inferior officer status"), it for the time being remains binding upon this Court. <u>See</u> Order, <u>Raymond J. Lucia Cos. v. SEC</u>, No. 15-1245 (D.C. Cir. June 26, 2017) (denying by an equally divided court petition for *en banc* review to consider, *inter alia*, whether to overrule <u>Landry</u>).

Here, the ICs, like the ALJs in <u>Landry</u>, are charged solely with "review[ing] and refer[ring]" allegations of wrongdoing, and the Committee's investigative power includes no

binding or final authority.  See 5 U.S.C. App. 3 § 11(d)(1),(7).  As a result, the Court need not

look beyond the lack of finality afforded to the IC's decisionmaking to determine that the

Commission members are not inferior officers.  Under the IGA, the IC is authorized only to refer

allegations to executive-branch agencies or to make recommendations to the Executive

Chairperson of CIGIE, the President or head of a designated Federal entity, or the congressional

committee of jurisdiction.  See 5 U.S.C. App. 3 § 11(d)(5), (d)(8)(A-B) (2014).  These referrals

and recommendations have no binding or legal effect, and, as Plaintiff concedes, the final

disposition of any given matter falls outside the IC's jurisdiction.  See SAC, ¶ 231 (stating that

"neither the President nor agency head are bound to execute the IC's disciplinary

recommendations").  Defendants represent, moreover, that the "the IC's declination to conduct

an investigation has [no] bearing on a final determination."  Opp. at 33.  Just as this Circuit held

in Landry that the ALJs in that case were "employees" rather than officers because they lacked

any "power of final decision," so too are the members of the IC imbued with no such powers.

Landry, 204 F.3d at 1134.  At bottom, therefore, the authority of the IC is solely advisory.

Because the Commission holds "purely recommendatory" authority, id., the Court concludes that

its members are not inferior officers for the purposes of the Appointments Clause.

        The Court notes, moreover, that even if the IC members did have sufficient powers to be

considered inferior officers, Plaintiff's Appointments Clause claim would nonetheless be futile.

This is because each of the members of the IC appointed by the Chairperson has already been

properly appointed as a government officer.  Under the 2014 version of the IGA, the IC is made

up of three statutorily specified appointees and four Inspectors General appointed by the

Chairperson of the Council.  See 5 U.S.C. App. 3 § 11(d)(2).  These eligible IGs are defined

under subsection (b)(1), which governs CIGIE membership and states that the Council consists,

in relevant part, of "all [IGs] whose offices are established under" Section 2 or 8G of the Act.  Id.

Those Sections in turn provide that IGs shall either be "appointed by the President, by and with

the advice and consent of the Senate," or, for certain "Federal entities," shall be "appointed by

the head of the designated Federal entity."  Id., §§ 2, 3, 8(G)(c).

It follows, therefore, that the IGs selected by the CIGIE chairperson to serve on the

Commission have already been constitutionally appointed as government officers.  That is, they

have either been appointed by the President or have been selected as IGs by their respective

"Heads of Departments."  U.S. Const. art. II, § 2, cl. 2.  Indeed, Plaintiff admits as much.  See

Reply at 23 (stating that "a person cannot be appointed to a majority of the IC member positions

without being an Officer of the United States").

Jefferson nonetheless asserts that the fact that the selected IGs are members of the

Commission in addition to functioning as agency IGs requires them to be appointed anew.  The

caselaw is clear, however, that officers need not be re-appointed simply because they take on

additional governmental duties.  In Weiss v. United States, 510 U.S. 163 (1994), for instance, the

Supreme Court rejected the argument that commissioned officers assigned to serve as military

judges must be separately appointed to such a role pursuant to the Appointments Clause.  The

Court held that the officers, who had been appointed by the President, could hold a military

judgeship without requiring a "second appointment" under the Clause "before assuming their

judicial duties."  Id. at 170.  Although the Court recognized that "military judges must possess

certain qualifications" above and beyond those of commissioned officers, it reasoned that the

"role of military judge is 'germane' to that of military officer."  Id. at 170-71, 176 (noting that

"no one could seriously contend that the positions of military lawyer or pilot, for example, are

distinct offices because officers performing those duties" are specially selected or possess

additional credentials).  The Court therefore concluded that the Appointments Clause required no additional appointment "before military officers may discharge the duties of [military] judge." Id. at 176.

Here, too, the role of a member of the IC is "germane" to that of an Inspector General. As Plaintiff himself asserts, the IG members of the IC "carry out functions that at least mirror . . . those that they carry out as Inspectors General of their own 'Federal entities.'"  Reply at 24. Contrary to Jefferson's claim that the IGs on the IC "were not properly appointed and confirmed to serve in their roles as members of the [Committee]," id. at 23, therefore, the selection of IGs for this related, secondary role does not require an additional appointment under the Appointments Clause.

The Court, accordingly, concludes that on both standing and the merits of his claim, Plaintiff's Appointments Clause count is futile, and amendment is thus unwarranted.

## IV.    Conclusion

As discussed above, much of Jefferson's proposed Second Amended Complaint may not proceed; indeed, Counts II and III are pled for appeal-preservation purposes only.  For the sake of clarity and brevity – and so that Defendants require no perspicacity to discern what remains alive – the Court will require that Plaintiff file a new version of his Second Amended Complaint alleging only his due-process claims, and setting forth only the facts that relate to these claims. This version of the Complaint shall be limited to 35 pages and shall be filed by January 18, 2018. A contemporaneous Order so stating shall issue this day.

Date:  January 4, 2018

/s/ James E. Boasberg
JAMES E. BOASBERG

United States District Judge